1 | Roger N. Behle, Jr., SBN 174755
2 | rbehle@foleybezek.com
  | Robert A. Curtis, SBN 203870
3 | rcurtis@foleybezek.com
  | Jordan A. Liebman, SBN 317930
4 | liebman@foleybezek.com
5 | **FOLEY BEZEK BEHLE & CURTIS, LLP**
  | 575 Anton Boulevard, Suite 710
6 | Costa Mesa, CA 92626
7 | Tel:  (714) 556-1700
  | Fax:  (714) 546-5005
8 | *Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOE GREGORY CARLINI, an individual, | Case No.: 2:19-cv-08306-GW-RAO |
|            Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
|     v. | **1. COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, ET SEQ.);** |
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; WILL PACKER PRODUCTIONS, INC., a California corporation; BLACK ENTERTAINMENT TELEVISION, LLC, a district of Columbia limited liability corporation; TINA GORDON CHISM, an individual; PETER HYUCK, an individual; ALEX GREGORY, an individual; JAS WATERS, an individual; WILL PACKER, an individual; JAMES LOPEZ, an individual; and DOES 1 through 100, inclusive, | **2. DECLARATORY JUDGMENT;** **3. UNFAIR COMPETITION (CAL. BUS. & PROF. CODE SECTION 17200, ET SEQ.); AND** **4. BREACH OF IMPLIED-IN-FACT CONTRACT** **DEMAND FOR JURY TRIAL** |
|            Defendants. | |

Plaintiff JOE GREGORY CARLINI ("Carlini" or "Plaintiff"), by and through his undersigned attorneys, hereby demands a jury trial, and for his Complaint against PARAMOUNT PICTURES CORPORATION, a Delaware corporation ("Paramount"), WILL PACKER PRODUCTIONS, INC., a California corporation ("WPP"), BLACK ENTERTAINMENT TELEVISION, LLC, a district of Columbia limited liability corporation ("BET"), TINA GORDON CHISM, an individual ("Chism"); PETER HYUCK, an individual ("Hyuck") ALEX GREGORY, an individual ("Gregory"), JAS WATERS, an individual ("Waters"), WILL PACKER, an individual ("Packer"), JAMES LOPEZ, an individual ("Lopez"), and DOES 1 through 100, inclusive (collectively "Defendants"), alleges as follows:

## PARTIES

1.     Plaintiff Joe Gregory Carlini is a California resident living in Hollywood, California. Carlini is an author and screenwriter.

2.     Defendant Paramount Pictures Corporation is a Delaware corporation with its headquarters and principal place of business in Los Angeles County, California.

3.     Defendant Will Packer Productions, Inc. is a California corporation with its headquarters in Los Angeles County, California.

4.     Defendant Black Entertainment Television, LLC, is a District of Columbia limited liability corporation doing business in Los Angeles County, California.

5.     Defendant Tina Gordon Chism is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

6.     Defendant Peter Hyuck is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

**FIRST AMENDED COMPLAINT**

7.     Defendant Alex Gregory is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

8.     Defendant Jas Waters is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

9.     Defendant Will Packer is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

10.     Defendant James Lopez is an individual believed to have performed the acts and omissions herein referenced in the County of Los Angeles, State of California.

11.     The true names and capacities, whether individual, corporate, partnership, associate, agent, employee, or otherwise of defendants named in this complaint as Does 1 through 100, inclusive (the "Doe Defendants"), are unknown to Plaintiff, who therefore sues such defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of the Doe Defendants when he has ascertained the same. Plaintiff is informed and believes, and on that basis alleges that, at all relevant times, the Doe Defendants were responsible in some manner for the conduct herein alleged and proximately caused Plaintiff's damages. Plaintiff is informed and believes, and on that basis alleges that, at all relevant times, the Doe Defendants were the agents of, and/or were acting in concert with, each of the other defendants and, in doing the things alleged, were acting within the scope of such agency. Any reference to the named defendants herein shall also constitute a reference to the Doe Defendants.

///

///

///

**FIRST AMENDED COMPLAINT**

1

## JURISDICTION AND VENUE

2      12.    This action arises under the Copyright Act of the United States, 17
3  U.S.C. Section 501, et seq. The jurisdiction of this Court is invoked pursuant to 28
4  U.S.C. Sections 1338 (a).

5      13.    Venue is properly laid in this Court pursuant to 28 U.S.C. Sections
6  1391(b) and 1400(a) in that the claim arises in this district and the Defendants may
7  be found and transact business in this district.

8

## FACTUAL BACKGROUND

9      14.    Plaintiff Carlini is an author and screenwriter. Carlini has won two
10 regional Emmy Awards and had his work shown on major television networks.
11 Additionally, Carlini sold his first feature film at Cannes Film Festival and the same
12 film was also exhibited at the Mall of America.

13 **A.    Plaintiff's Screenplay,** *What The F Is He Thinking?*

14      15.    In 2014, Plaintiff began writing an original screenplay for a feature-
15 length film along with David Collins ("Collins"), which had as its central plot point
16 a woman obtaining the ability to hear men's thoughts. By 2015, Plaintiff and Collins
17 had written a complete draft of the screenplay, titled *What The F Is He Thinking?*

18      16.    In August 2015, Plaintiff registered *What The F Is He Thinking?* with
19 the U.S. Copyright Office and received registration number Pau003796018. A true
20 and correct copy of the Registration Certificate for *What The F Is He Thinking?* is
21 attached hereto as **Exhibit A**. The screenplay for *What The F Is He Thinking?* was
22 also registered with the Writers Guild of America West.

23      17.    Plaintiff has never licensed or otherwise authorized anyone (including
24 Defendants) to copy, distribute, or publicly disseminate *What The F Is He*
25 *Thinking?*, or to make derivative works based upon it.

26 ///
27 ///
28 ///

---

**FIRST AMENDED COMPLAINT**

**B.      Plaintiff and Collins Shop the Screenplay for *What The F Is He Thinking?***

18.      Starting in 2015, Plaintiff and Collins began shopping *What The F Is He Thinking?* to various production companies, studios, financers and actors. Broadly construed, "shopping" involves the process of circulating and/or pitching a project to various production companies, studios and film financers for the purpose of securing production, financing, and/or distribution of the project. Efforts are also undertaken during the shopping process to attach key talent and/or a director to the project. During the shopping process, Plaintiff and Collins met with representatives of the following production companies and/or studios: Weinstein Company (now Lantern Entertainment), Montage Films, and Bloom. Plaintiff also spoke with potential talent, such as James Franco, Chris Pratt, King Bach, and Nick Swardson. Plaintiff and Collins also provided their screenplay to an intermediary, who, Plaintiff is informed of and believes, passed the screenplay on to RatPac Entertainment, a motion picture production and financing company.

19.      The last meeting Plaintiff had with a studio representative was in July 2017, when he met with a representative from Bloom. At this meeting, Plaintiff provided the screenplay and business plan for *What The F Is He Thinking?* to the representatives. This was done in furtherance of facilitating a potential business relationship.

20.      *What The F Is He Thinking?* was not picked up by any of the production companies or studios Plaintiff and Collins met with. However, key protectable elements of Plaintiff's plot, themes, dialogue, mood, setting, pace, characters and sequence of events from his copyrighted screenplay, *What The F Is He Thinking?*, eventually appeared in a film produced by Defendants: *What Men Want*, as described in detail below

///

///

**C.      Access to the Screenplay for *What The F Is He Thinking?***

21.      Plaintiff and/or Collins provided the screenplay for *What The F Is He Thinking?* and other materials to several individuals and/or companies connected to Defendant Paramount. These individuals are:

a.  Dan Guando: Mr. Guando received the screenplay in June of 2015. Mr. Guando is a production manager at Endeavor Content, which produced the 2019 film *Book Smart*. That film was distributed by Paramount.

b.  Josh Henderson: He received the screenplay in the summer of 2015. Mr. Henderson is an actor and acted in the 2005 film *Yours, Mine & Ours*, which was produced and distributed by Paramount.

c.  David Ranes: He received the screenplay in September 2015. In 2013, Mr. Ranes joined with Grace Roder Oppenheimer (mentioned below) and Tom DeSanto to form the company New Myth Entertainment. Mr. DeSanto is a producer and screenwriter and has worked with Paramount on several projects in the X-Men and Transformers film franchises.

d.  Grace Roder Oppenheimer: She received the script in November 2016. As stated above, she joined with Mr. Ranes and Mr. DeSanto to form New Myth Entertainment and Mr. DeSanto has worked with Paramount on several projects.

22.      Plaintiff and/or Collins also provided the screenplay and related materials to several individuals and companies in the film industry whom Plaintiff alleges, on information and belief, provided the screenplay to one or more Defendants. Those individuals and/or companies are:

a.  Richard Switzer (producer, writer, and actor);

b.  Ronnie Benarie (talent manager);

c.  Jared Safier (producer, actor, and writer);

d.  Missy Valdez (producer);

      e.  Shawn Christian (actor);

      f.  William Thibodeau (actor and producer);

      g.  Nick Swardson (producer, writer, and actor);

      h.  Erin Johnson (actress);

      i.  Adrienne Williams (actress);

      j.  Joe Nahas (actor, producer);

      k.  David Cade (producer, writer, and actor);

      l.  Christian Ashton (producer, visual effects artist)

      m. Aurora Pfeiffer (Talent Manger, Creative Consultant)

      n.  Lewis Meyer (composer);

      o.  Curt Kufner (producer);

      p.  Tonia Kufner (producer);

      q.  Paul Aaron (producer);

      r.  Zac Sanford (writer);

      s.  Andrew Balogh (composer);

      t.  Bobby Marsden (producer and actor);

      u.  Alex Townsend (producer);

      v.  Shannon Thames (producer);

      w. Robert Schwartz (producer, director, and writer);

      x.  Direct Artist Management, f/k/a Reboot the People (talent management group);

      y.  Jay Brentwood;

      z.  Lynn Mooney (producer);

      aa. Anna Goncalves (editing).

The above-referenced individuals and companies are just a representative sampling of all of the parties who received the screenplay. Over seventy individuals and companies in or connected to the film industry received the Plaintiff's screenplay.

*///*

**FIRST AMENDED COMPLAINT**

**D.      The Film, *What Men Want*.**

23.      Based on information and belief, in or about November 2017 (around two and a half years after Plaintiff copyrighted *What The F Is He Thinking?*), one or more of Defendants approached actress Taraji Henson ("Henson") to star in a film about a woman who gains the ability to hear men's thoughts. Based on information and belief, at the time Henson was approached, there was no screenplay for the proposed film, which ultimately became the film, *What Men Want*. Principal photography for *What Men Want* started around five months after the meeting with Henson and started without a complete script.

24.      Paramount announced in 2017 (before it even had a script) that it was "fast-tracking" the film for release in early 2019, alleging the film to be a loose remake of the 2000 Nancy Meyers film *What Women Want*.

25.      *What Men Want* was produced by Packer, Lopez, Paramount Players (a subsidiary of Defendant Paramount), WPP, and BET, and was distributed by Paramount. The screenplay for the film was credited to Defendants Chism, Gregory, and Hyuck.

26.      In a trailer for *What Men Want*, the narrator states: "It's the question women have been asking since the dawn of time: 'what is he thinking?'"[1] This is substantially similar to the beginning of the logline and the title of Plaintiff's copyrighted work: "For thousands of years, women have wanted to know . . ." *What The F Is He Thinking?*

27.      *What Men Want* premiered in theaters in the United States on February 8, 2019. The film stars Henson as the main character, Josh Brener as the main character's sidekick, and Aldis Hodge as the main character's love interest.

---

[1] *What Men Want (2019) 'What Is He Thinking?' TV Spot [HD] Starring Taraji P. Henson*, YOUTUBE (Feb. 2, 2019), https://www.youtube.com/watch?v=KQUDTujQo3g&feature=youtu.be.

1    28.    As of the filing of this Complaint, *What Men Want* has grossed

2    approximately $72,216,294 from box offices worldwide.

3    **E.    Similarities Between *What The F Is He Thinking?* and *What Men Want*.**

4    29.    Broadly construed, *What The F Is He Thinking?* is about a young

5    working professional woman, who—after a night of partying and drinking alcoholic

6    beverages—hits her head. She then wakes up in the hospital and realizes that she

7    has the power to hear men's thoughts. That power helps her navigate a world

8    teething in sexism and misogyny, as she can now hear and understand the innermost

9    thoughts of men who mistreat and objectify women. Additionally, the main

10   character uses this power in various romantic situations. For example, the main

11   character helps her close friend, a gay male, start a romantic relationship with

12   another male who at first is believed to be straight (this happens at the friend's

13   work). Because the main character can hear the man's thoughts, she is able to

14   discern that he is actually attracted to men, which opens the door to a relationship

15   with the main character's gay friend. The main character also uses her power to read

16   a male character's mind to unveil his unfaithfulness. As the story progresses, the

17   main character starts a romantic relationship of her own with a well-mannered and

18   respectful male bartender. However, the main character soon learns that simply

19   knowing what a man is thinking is not always the solution to her problems, as

20   personal relationships grow more complicated. The main character and the

21   bartender have a falling-out and the main character eventually annoys her friends

22   with her antics. The main character then hits her a head a second time and, after

23   waking up in the hospital again, realizes that her power is lost when she cannot hear

24   a male doctor's thoughts. Eventually, the main character and the bartender reconcile

25   at a special event that is personally important to the bartender. The story of the main

26   character and her temporary ability to hear men's thoughts covers themes such as

27   sexism, misogyny, romantic relationships, and the value of truth, among others.

28

**FIRST AMENDED COMPLAINT**

30.     While the above paragraph accurately summarizes the main plot, themes, dialogue, mood, setting, pace, characters and sequence of events from Plaintiff's copyrighted screenplay, *What The F Is He Thinking?,* it also accurately summarizes those same elements from Defendants' film, *What Men Want*. Indeed, the main plot, themes, dialogue, mood, setting, pace, characters and sequence of events from Plaintiff's copyrighted screenplay, *What The F Is He Thinking?* are substantially and/or strikingly similar to those in the film, *What Men Want*, as follows.

31.     Both *What The F Is He Thinking?* and *What Men Want* feature substantially and/or strikingly similar plots, settings, sequences of events, characters, moods, dialogue, pace and themes.

32.     In the beginning of *What The F Is He Thinking?*, the main character, Angela Smith ("Angela"), *wishes* she could know what her then-fiancé, Eddie Sligh, is thinking and *wishes* she better understood men. In *What Men Want*, the main character, Ali Davis ("Ali") *wishes* that she can better connect with men.

33.     In *What The F Is He Thinking?*, Angela meets a well-mannered and respectful bartender, Thomas Riley ("Thomas"), who soon becomes her love interest. Angela and Thomas first meet at a restaurant that Angela frequents. Thomas serves Angela a drink, they have a bonding moment, and their hands briefly touch. Thomas is raising his younger brother, who is in junior high school, on his own as the brother's legal guardian. In *What Men Want*, Ali meets a well-mannered and respectful bartender, Will, who soon becomes her love interest. Ali and Will first meet at a restaurant that Ali frequents. Will serves Ali a drink, they have a bonding moment, and their hands briefly touch. Will has a young son, who he raises on his own as a single father. Of all the possible careers the main character's love interest could have (there are literally thousands), Defendants "chose" a bartender. There is nothing in the romantic-comedy genre that required Defendants to make the main character's love interest a bartender. There are hundreds of non-infringing

**FIRST AMENDED COMPLAINT**

careers for males that have been used with regularity in the romantic-comedy genre. The most common examples are (1) Journalist/Writer, (2) Architect, (3) Salesman, (4) Retail, (5) Businessman, (6) Artist, (7) Teacher, (8) Unemployed, (9) Advertising, (10) Musician; (11) Politician, (12) Bookstore Owner.[2] "Bartenders" are not common. Indeed, Defendants "choice" of making the main character's love interest a bartender is a telltale sign that Defendants copied Plaintiff's script. Further, it is not coincidental that the main character in *What Men Want* meets her love interest in a restaurant she frequents. It is further evidence of copying. There are literally thousands of places Defendants could have selected for this meeting to occur if they had not copied Plaintiff's script (a park, an airplane, a wedding, a church/synagogue, a blind date, etc. *ad infinitum*). Further, there was nothing in the romantic-comedy genre that compelled Defendants to make the main character's love interest the caretaker of a young boy. Defendants made that "choice" because it was an element of Plaintiff's script. Had Defendants not copied Plaintiff's script, they could have chosen to make the love interest a caretaker of a daughter, a niece, an aging mother, a sickly brother, a neighbor, a stray animal, etc. *ad infinitum.* Or, they could have chosen not to have the love interest care for anyone at all. As to these three elements alone (career of love interest, place of meeting love interest, and caretaker status of love interest), it is statistically unfathomable that Defendants randomly happened to "choose" the exact same three elements that appeared in Plaintiff's script. The only explanation for these same three elements appearing in *What Men Want* is copying of Plaintiff's script by Defendants.

34.     Further, In *What The F Is He Thinking?*, Angela trips and hits her head after a night of partying and heavy drinking with friends. She is at a friend's event,

---

[2] https://www.newyorker.com/humor/daily-shouts/romantic-comedy-jobs-updated-for-2016; https://www.elitesingles.com/mag/relationship-advice/romantic-comedy-jobs; https://film.avclub.com/everyone-s-an-architect-11-jobs-common-only-in-romanti-1798266423

**FIRST AMENDED COMPLAINT**

namely a birthday party. After the blow to the head, she wakes up in the hospital to discover that she can hear men's thoughts. In *What Men Want*, Ali trips and hits her head after a night of partying and heavy drinking with friends. She is at a friend's event, namely a bachelorette party. After the blow to the head, She wakes up in the hospital to discover that she can hear men's thoughts. Creatively, a writer could select among thousands of different methods by which a character acquires the power to hear someone's thoughts. The character could be born with the power; they could have a device implanted giving them the power; they could have a magic spell cast over them giving them the power; they could have been bitten by a radioactive spider; etc. *ad infinitum*. Instead, here, Defendants' "chosen" method by which Ali acquired the power to hear men's thoughts was exactly the same as the method chosen in Plaintiff's script – hitting her head after a night of partying and drinking. Indeed, if Defendants' anticipated deflection of this point is to be believed – namely, that a "fowl-smelling-drug-laced-tea" gave Ali the power – there was no need for Ali to go out partying and drinking, or to hit her head. The reference to the tea given by the Psychic is how "she got the power," yet she doesn't hear any internal thoughts until a blow to the head. Nor does the Psychic gain the power by drinking the same tea. In the *What Men Want* bonus features on Blu Ray, director Adam Shankman admits Ali gained the power from a blow to the head, contradicting the story in their plot. And, beyond this, it was not the state of unconsciousness in both characters that evidences copying, it is that Defendants "chosen" method of becoming unconscious was identical. Ali could have become unconscious after drinking the tea; she could have been rendered unconscious after being electrocuted by her hairdryer; she could have lost consciousness scuba diving, etc. *ad infinitum*.  Further, there was nothing in the romantic-comedy genre that required the main character in *What Men Want* to be taken to a hospital, or for that character to first realize that she has the power in the hospital. The only reason they

appear in *What Men Want* is that these exact same elements appear in Plaintiff's copyrighted script.

35.    In *What The F Is He Thinking?*, the first person to learn of Angela's newfound power is her close friend, T.J., who is gay. In *What Men Want*, the first person to learn of Ali's newfound power is her close friend and assistant, Brandon, who is gay. Creatively, there are countless characters Defendants could have chosen from to be the person that first learns of the Ali's newfound power, including her father; the doctor who treated her; the psychic; a random person on the street; one of her girlfriends; her boss, etc. *ad infinitum*. That Defendants "chose" to have the main character's gay sidekick be the first person to learn of the power (which is identical to Plaintiff's script) is further evidence of copying. Moreover, in *What The F Is He Thinking?*, Angela eventually helps T.J. start a romantic relationship by informing him that the man that T.J. is romantically interested in is actually gay, and not straight as previously believed. This happens at T.J.'s work. Identically, in *What Men Want*, Ali eventually helps Brandon start a romantic relationship by informing him that the man that Brandon is romantically interested in is actually gay, and not straight as previously believed. This also happens at Brandon's work. Both Ali and Angela inform her gay sidekick that the closeted gay guy actually has a crush on him. The decision to include a gay sidekick character in a story about the power to hear the thoughts of the opposite sex is not an obvious one, or one common in the romantic-comedy genre. There was no such character, for example, in the movie *What Women Want*. But, beyond this, the decision to add to that sub-plot: (a) that the gay sidekick has a closeted gay love interest at his work, (b) that the main character, through her power, is able to discover that the love interest is also gay (not straight, as previously believed), (c) that the main character then assists that gay sidekick to pursue a relationship with the love interest, and (d) that the main character lets the gay sidekick know that the closeted gay guy actually has a crush on him, leading them toward becoming a couple late into the third act of the story,

is a one-in-a-million series of creative choices that Defendants copied from Plaintiff's script. By way of example, Defendants could have elected to give Ali a straight male assistant/confidant whom she could have helped through her powers to find a good/honest girlfriend; or Defendants could have given Ali a female assistant/confidant that had a crush on a male coworker, whom Ali could have "vetted" for her assistant; or Defendants could have elected to give Ali no assistant/confidant at all. That Defendants took the exact same chosen expression of these characters, character traits, and sub-plot lines from Plaintiff's script is further evidence of copying.

36.    Moreover, in both stories, the main character uses her power to discover that a male character has been unfaithful in his relationship. In *What The F Is He Thinking?*, Angela reads the mind of her fiancé to discover that he has been unfaithful to her. In *What Men Want*, Ali reads the mind of the fiancé of one of her friends and discovers that the man cheated on her friend. The result of these events is the same in both stories: the marriage is called off once the fiancé's infidelity is revealed. There were countless creative options available to Defendants in which Ali could have used her power beyond revealing an unfaithful male character. For example, they could have chosen to have the male character lie about a gambling problem, a drug addiction, being fired from a job, etc. *ad infinitum*. Defendants also could have elected to have Ali use her power to, for example, discover and help a man that was contemplating suicide (like in the 2000 film *What Women Want*); help a man reconnect with an estranged child; help another woman from getting swindled by a shady businessman. The possibilities are endless. That Defendants took the exact same chosen expression of these characters, character traits, and sub-plot lines from Plaintiff's script is further evidence of copying.

37.    Moreover, in *What The F Is He Thinking?*, Angela uses her power to get close to her love interest, Thomas. However, in the second half of the story, the characters have a falling out. Nevertheless, Angela and Thomas end up getting back

together at the end of the story at an event of personal significance to Thomas, his art show. In *What Men Want*, Ali uses her power to get close to her love interest, Will. However, in the second half of the story, the characters have a falling out. Nevertheless, Ali and Will end up getting back together at the end of the story at an event of personal significance to Will, his son's birthday party.

38.    In both stories, before the main character reconciles with her love interest, she loses her power after being hit in the head a second time. Both Angela and Ali realize that their power is gone when they are unable to hear the thoughts of a *male doctor*. Why a male doctor? Defendants could have chosen from among thousands of different settings in which the main character realizes she has lost the power. That Defendants took the exact same chosen expression of this discovery (power is gone) from Plaintiff's script is further evidence of copying.

39.    In summation, *What Men Want* clearly copies key plot elements, characters, themes, events, mood, and pace of *What The F Is He Thinking?*, including, without limitation, the following:

    a.    **Plot:** *What The F Is He Thinking?* and *What Men Want* present the same plot in the same sequence. Both stories are intended for a mature audience (*What The F Is He Thinking?* was planned for an R-rating and *What Men Want* was R-rated) and both are about a woman who: (1) wishes she can better understand men; (2) has a close friend/confidant who is gay; (3) meets a respectful and nice male bartender who stands out from the other sexist and misogynistic men in the story; (4) develops a romantic relationship with the bartender; (5) hits her head after a night of partying and heavy drinking; (6) goes to the hospital as a result of hitting her head; (7) first learns in the hospital that she has the power to hear men's thoughts; (8) uses that power to her advantage in her relationships and career; (9) uses the power to help her friends in personal and romantic relationships; (10) loses the power after hitting her head again; (11) goes to the hospital again as a result of hitting her head; (12) realizes she has lost the power in the hospital; and (13)

ultimately reconciles with her love interest after a separation earlier in the story. These thirteen plot elements are highly specific, purposeful, and well developed and their presence in Defendants' film cannot be explained away as mere coincidence or generic plot elements.

       b. **Characters:** The lead characters in *What The F Is He Thinking?* and *What Men Want* are substantially similar.

             i. <u>Main Characters:</u> The main character in *What The F Is He Thinking?* is Angela, who begins the story wishing she could better understand men. The main character in *What Men Want* is Ali, who begins the story wishing she could better understand men. Both women are professionals. One is a teacher and the other is a sports agent. While the main characters have different professions, those differences are superficial. Both characters obtain the same power—to hear men's thoughts—once they fall and hit their heads after a night of heavy partying and heavy drinking. Both Angela and Ali realize they can hear men's thoughts only after they are taken to the hospital to recover from their head injuries. Both learn they have the power in the hospital. Both characters use that power to improve their careers: Angela uses the power to better understand her students and Ali uses the power to better understand athletes. Both have a love interest who is a bartender. Both meet the bartender before they gain their power. Both have a friend who is gay, who they end up helping by identifying a gay companion, earlier believed to be straight. Both are surrounded by misogynistic men: Angela's initial boyfriend/fiancé is misogynistic and Ali's male work colleagues and superiors are misogynistic. Both use their power to get close to their respective love interests (both

of whom are bartenders): Angela uses her power to know what her love interest wants and for initiating sex, while Ali uses her power to know what her love interest wants and for satisfying his sexual desires. Both lose their power after hitting their head a second time. Both realize they have lost their power in the hospital. Both learn they have lost their power when they cannot hear the thoughts of a male doctor in the hospital. Both ultimately reconcile with their love interest by appearing at a special event: Angela appears at Thomas' art show and Ali appears at Will's son's birthday party.

ii. <u>Sidekicks:</u> Both Angela and Ali have a witty sidekick who is gay. In *What The F Is He Thinking?*, T.J. is Angela's close friend and confidant, who learns that Angela can hear men's thoughts shortly after Angela leaves the hospital. In *What Men Want*, Brandon is Ali's friend and confidant, and learns that Ali can hear men's thoughts shortly after Ali leaves the hospital. In *What The F Is He Thinking?*, T.J. communicates directly to Angela with his thoughts instead of speaking. In *What Men Want*, Brandon communicates directly to Ali with his thoughts instead of speaking. Both T.J. and Brandon are romantically interested in a man who initially is portrayed as straight. In both works, Angela and Ali listen to the seemingly straight man's thoughts and figure out each is actually gay and has a crush on the gay sidekick. With this knowledge, T.J. starts a relationship with the man who once was believed to be straight and Brandon does the same.

iii. <u>Love interests:</u> In both *What The F Is He Thinking?* and *What Men Want*, Angela's and Ali's primary love interest is a polite

**FIRST AMENDED COMPLAINT**

and likeable bartender who stands out from the other sexist and misogynistic men present in each story. Both the love interest in *What The F Is He Thinking?*, Thomas, and the love interest in *What Men Want*, Will, are men who are raising a younger male family member on their own: Thomas is taking care of his younger brother and Will is raising his son. Both Thomas and Will have pure thoughts about Angela/Ali and become romantically interested in Angela/Ali.

c.   **Events:** The events in both *What The F Is He Thinking?* and *What Men Want* are substantially the same. The only difference is that *What Men Want* has a handful of side plots related to Ali progressing in her career as a sports agent. However, that difference is superficial given the substantial and/or striking similarities between both stories in almost all other regards. Both stories contain the same primary events in the same sequence: (1) the main character is unsatisfied with her life and wishes she could understand men better, (2) the main character meets her future love interest at a restaurant she frequents, (3) the main character falls and hits her head after partying and heavily drinking with her friends, (4) the main character wakes up at the hospital and discovers in the hospital she can hear men's thoughts, (5) the main character uses her newfound power to help herself and her friends, (6) the main character and her love interest (both bartenders) get together, (7) the main character makes several mistakes, isolating her friends and eventually causes a falling out with her love interest, (8) the main character hits her head a second time and loses her ability to hear men's thoughts, (9) the main character makes amends with her love interest at an event important to the love interest at the end of the story. Further, there are numerous scenes and situations from *What The F Is He Thinking?* that are nearly identical to those found in *What Men Want,* including but not limited to the following: a) a jock, whose thoughts are heard by the main character, mistakenly thinks that the main character and her

**FIRST AMENDED COMPLAINT**

gay sidekick are dating; b) the main character shows up unexpectedly to a place where she is not welcome, and while the male character there plays it off as being okay that she is present, the main character hears his contradicting thought: "What the **** is she doing here?", on top of this Ali and Angela both achieve their goal by attending these events, with Angela's goal of finding out Eddie's faithfulness and Ali's goal on better her relationship with a potential client to make partner; c) the main character overhears the thoughts of two male characters, who share the same echoing thoughts simultaneously when interacting with each other (*What the F Is He Thinking?* – Gary: "I still can't believe that kid had sex in my car." and Thomas: "I still can't believe I had sex in her Dad's car." *What Men Want* – Karl Anthony Towns: "Kid's nervous, probably thinking 'Holy shit it's Karl Anthony Towns!'" and Jamal Barry: "Holy shit it's Karl Anthony Towns!" Both take place at the same place in the story); d) the main character hears her love interest's thought: "Wow, she is beautiful."; e) in the second half of the story, the main character hears a man's thought about missing out on viewing a sporting event while sitting in a church service; f) in *What Men Want*, after the main character's power is lost, the group of girls meet at a Mexican restaurant for "Margarita Monday," and in *What The F Is He Thinking?,* after the main character's power is lost, the group of guys meet at a Mexican restaurant for "Taco Tuesday;" g) after the power is lost, the main character discovers that her gay sidekick and his closeted love interest are dating; h) after losing her power, the main character has a conversation with her father; and i) the main character first meets her love interest as he is bartending at a restaurant he works at, and the next time they see each other is at the main character's work, with the love interest's kid in attendance. j) an antagonist is called out in front of girls he's seeing, one being at Ali's friends' wedding, and the other at Eddie's place; k) both stories include the main character helping her girl-friend, by letting them know that the guy they are interested in is a pig; and l) both stories feature a father who is overprotective of his daughter (the

**FIRST AMENDED COMPLAINT**

main character), and does not accept the love interest until he realizes the love interest is a good guy with manners. All of these similarities are absent in the 2000 film *What Women Want*.

    d.  **Mood and Pace:**

        i.  <u>Mood:</u> Both *What The F Is He Thinking?* and *What Men Want* feature a woman navigating a sexist and misogynistic world. Both stories also feature sexual themes and raunchy humor.

       ii.  <u>Pace:</u> Both *What The F Is He Thinking?* and *What Men Want* progress at the same pace and in the same order of main events. Coincidentally – with one page equating to approximately one minute of film run time – *What The F Is He Thinking?* Is a total of 107.75 pages. *What Men Want* has a run time (from the first scene of the film to the end of the last scene) of approximately 107.85 minutes, nearly identical in length. Many substantial scenes that are similar in *What Men Want* and *What The F Is He Thinking?* are within a few pages of each other (e.g. the scene where the main character's power is lost is one page apart from the *What The F Is He Thinking?* script (p. 90) and *What Men Want* run time (88 Minutes and 40 seconds, which, applying the screenwriting rule, would be page 89).

40.    Additionally, aspects of *What Men Want* are lifted directly from the business plan for *What The F Is He Thinking?* Carlini's business plan for *What The F Is He Thinking?* included marketing the potential film with sports stars acting in cameo roles. Carlini and Collins discussed this idea with Terrell Owens (former professional football player who played in the National Football League ("NFL") and member of the Pro Football Hall of Fame), Cordarrelle Patterson (current wide receiver for the Chicago Bears of the NFL), and Brett Burns (professional ice hockey player who plays for the San Jose Sharks and is one of the highest paid

National Hockey League ("NHL") players). *What Men Want* directly uses this idea with several current and retired professional basketball and football players playing themselves in the film, including Shaquille O'Neal, John Collins, Grant Hill, Karl-Anthony Towns, Devonte Freeman, and Lisa Leslie.

41.     Another example of Defendants unlawfully appropriating protectable expression from *What The F Is He Thinking?* is evident in a November 2018 trailer for *What Men Want*.[3] In the trailer—posted by Defendant Paramount on its YouTube channel—after the main character, Ali, and her sidekick, Brandon, fully realize that Ali can read men's thoughts, Brandon tells Ali that "you could use this [her power] to your advantage," to which Ali responds "you're right." This is virtually identical to an exchange between the main character, Angela, and her sidekick, T.J., in *What The F Is He Thinking?* In Plaintiff's copyrighted script, after Angela and T.J. fully process Angela's power to read men's thoughts, T.J. tells Angela that "you can really use this [Angela's power] to your advantage," to which Angela eventually responds by saying "you're right."

**D.     While *What Men Want* Shares a Similar Title to the 2000 Film *What Women Want*, the Substance, Themes, and Characters of *What Men Want* are not Based on that Film.**

42.     When one hears the title *What Men Want*, one may recall an earlier movie with a similar title, *What Women Want*. However, while *What Men Want* shares a similar title and basic premise as the 2000 film, *What Women Want*, the specific elements of *What Men Want* (described above) are clearly not based on that film and are instead copied from *What The F Is He Thinking?* The following differences between *What Men Want* and *What Women Want* are clear:

---

[3] *What Men Want (2019) - Red Band Trailer - Paramount Pictures*, YOUTUBE (Nov. 23, 2018), https://www.youtube.com/watch?v=oIrQ7q0xdVc&feature=youtu.be.

a. In *What Women Want*, the main character (played by Mel Gibson) gains the power to hear women's thoughts after he is electrocuted and loses that power in the same way. The main character does not hit his head to gain the power. In *What Men Want* and *What The F Is He Thinking?*, the main character gains and loses her power from hitting her head.

b. In *What Women Want*, the main character realizes he can hear women's thoughts while at his apartment; he also realizes that he has lost his power at his co-worker's apartment. In *What Men Want* and *What The F Is He Thinking?*, the main character realizes she can hear men's thoughts and realizes she has lost her power, both while at the hospital.

c. In *What Men Want* and *What The F Is He Thinking?*, both main characters wish they could understand men better. There is no similar desire in *What Women Want* before the main character gains his power.

d. In *What Women Want*, the main character's power helps him overcome his own sexism and misogyny. In *What Men Want* and *What The F Is He Thinking?*, the female main characters must overcome the sexism and misogyny directed at them by men.

e. In *What Men Want* and *What The F Is He Thinking?*, each main character has a sidekick who is gay. The main characters in those stories use their powers to help their sidekicks obtain romantic relationships. This storyline is completely absent from *What Women Want*.

43. Furthermore, even the director of *What Men Want* admitted that the film is not a copy of *What Women Want*, stating in an interview that *What Men Want* is "so not a remake."[4] Additionally, several film critics have noted that, other

---

[4] Ali Joseph, *Taraji P. Henson in "What Men Want": Don't call it a remake of a Mel Gibson movie*, SALON (Feb. 9, 2019, 4:00 PM), https://www.salon.com/2019/02/09/taraji-p-hensons-what-men-want-dont-call-it-a-remake-of-a-mel-gibson-movie/.

**FIRST AMENDED COMPLAINT**

than its title and basic premise, *What Men Want* is not similar at all to *What Women Want*. For example, one critic noted that *What Men Want* "doesn't borrow much more than the original film's [*What Women Want*] core premise."[5] And another critic has stated:

> One of the first things to know about What Men Want is that it requires little familiarity with its predecessor, Nancy Meyers' 2000 Mel Gibson starrer What Women Want. Although the filmmakers of the update name-check screenwriters Cathy Yuspa and Josh Goldsmith in this feature "inspired by" Meyers' movie, they pretty much dispense with most of the details from the original.[6]

44.     Based on the above, *What Men Want* clearly was not an adaptation or remake of *What Women Want* with a new angle or for a new audience. Instead, *What Men Want* is a completely different film with different characters, events, and themes. And the characters, events, and themes of *What Men Want* are direct copies and/or are derivative of the characters, events, and themes of *What The F Is He Thinking?*

## **FIRST CLAIM FOR RELIEF FOR COPYRIGHT INFRINGEMENT**
### **(Against All Defendants)**

45.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them here as though fully set forth herein.

46.     Plaintiff is the sole owner of the copyright in an original work that is fixed in a tangible medium of expression. Plaintiff obtained the copyright for his work, *What The F Is He Thinking?*, on August 14, 2015, under registration number Pau003796018 (See Exhibit A).

---

[5] Carolin Siede, *Film Review: What Men Want Flips the Script and Finds Mixed Results*, Consequence of Sound (Feb. 7, 2019, 6:32 AM), https://consequenceofsound.net/2019/02/film-review-what-men-want/.

[6] Justin Lowe, *'What Men Want': Film Review*, Hollywood Reporter (Feb. 6, 2019, 10:00 PM), https://www.hollywoodreporter.com/review/what-men-want-review-1182787.

**FIRST AMENDED COMPLAINT**

47.     Based on information and belief, Defendants have produced, reproduced, and prepared a derivative work (*What Men Want*) based upon and copied from Plaintiff's protected work (*What The F Is He Thinking?*) without Plaintiff's consent.

48.     Defendants' infringement has been undertaken knowingly, and with intent to financially gain from Plaintiff's protected copyrighted work. Defendants have failed to exercise their right and ability to supervise persons within their control to prevent infringement, and they did so with intent to further their financial interest in the infringement of *What The F Is He Thinking?* Accordingly, Defendants have directly, contributorily, and vicariously infringed Plaintiff's protected work.

49.     Because of Defendants' infringing acts, Plaintiff is entitled to actual damages and Defendants' profits attributable in an amount to be proven at trial, and all other relief allowed under the Copyright Act (17 U.S.C. § 101, *et seq.*).

## SECOND CLAIM FOR RELIEF FOR A DECLARATORY JUDGMENT
### (Against All Defendants)

50.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them here as though fully set forth herein.

51.     An actual controversy has arisen and now exists relating to the rights and duties of Plaintiff and Defendants under U.S. copyright laws in that Plaintiff contends that Defendants' use, reproduction, marketing, sale, and distribution of *What Men Want* infringe upon Plaintiff's exclusive copyrights in *What The F Is He Thinking?* Upon information and belief, Plaintiff alleges that Defendants contend that their use, reproduction, marketing, sale, and distribution of *What Men Want* are lawful.

52.     A judicial declaration is necessary and appropriate at this time under the circumstances presented in order that the parties may ascertain their respective rights.

**FIRST AMENDED COMPLAINT**

53.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff is entitled to a judicial determination of his rights and a judicial declaration that Defendants' use, reproduction, marketing, sale, and distribution of *What Men Want* infringe upon Plaintiff's exclusive rights in *What The F Is He Thinking?* in violation of the U.S. copyright laws.

## THIRD CLAIM FOR RELIEF FOR UNFAIR COMPETITION

### (Cal. Bus. & Prof. Code Section 17200, et seq.)

### (Against All Defendants)

54.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them here as though fully set forth herein.

55.     Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair, or fraudulent business act or practice…"

56.     By engaging in the alleged conduct, Defendants have engaged in unlawful, unfair, or fraudulent business acts of unfair competition in violation of Cal. Bus. & Prof. Code Section 17200, et seq.  This conduct includes Defendants' unauthorized use of Plaintiff's copyrighted work and unlawful appropriation of Plaintiff's property.

57.     As an actual and proximate result of Defendants' unfair competition, Defendants have unjustly enriched themselves by, among other things, obtaining profits, depriving Plaintiff of the compensation to which he is rightly entitled, and taking credit for Plaintiff's original work. Plaintiff is thus entitled to restitution of such sums in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF FOR BREACH OF IMPLIED-IN-FACT CONTRACT

### (Against All Defendants)

**FIRST AMENDED COMPLAINT**

58.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them here as though fully set forth herein.

59.   In deciding whether a contract was created, the Court will consider the conduct and relationship of the parties as well as all of the circumstances of the case. "An implied-in-fact contract is based on the conduct of the parties." *Unilab Corporation v. Angeles-IPA*, 244 Cal. App. 4th 622, 636 (2016).

60.   In the entertainment industry, it is standard to receive compensation for the use of a party's pitched ideas. *Hutchinson v. Deutsche Bank Securities Inc.*, 647 F.3d 479, 481 (2d Cir. 2011). California has long held implied-in-fact contracts enforceable when a writer pitches an idea and a studio uses it without compensating the writer. *Desny v. Wilder*, 46 Cal. 2d 715 (1956).

61.   The circumstances of Plaintiff providing access to Plaintiff's pitch and related material shows that Plaintiff intended to pitch the project to Defendants.

62.   Defendants then used Plaintiff's pitch in the Film.

63.   Plaintiff understood at the time that fair compensation for the use of his pitch would be equivalent to the industry standard amount for compensation. This amount will be proven at time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.   That Defendants be adjudged to have infringed upon Plaintiff's copyrights in *What The F Is He Thinking?* in violation of 17 U.S.C. § 101, *et seq.*;

2.   That Defendants be required to account to Plaintiff for any and all profits derived by their exploitation of *What The F Is He Thinking?* in all media, from all sources, worldwide;

3.   That Defendants be ordered to pay over to Plaintiff all damages, including future damages, that Plaintiff has sustained, or will sustain, as a consequence of the acts complained of herein and that Plaintiff be

awarded any profits derived by Defendants as a result of said acts, or as determined by said accounting, or in the alternative, statutory damages, pursuant to 17 U.S.C. § 504;

4.      For a judicial declaration that Defendants' use, reproduction, marketing, sale, and distribution of *What Men Want* infringes on Plaintiff's exclusive rights in *What The F Is He Thinking?* under the copyright laws;

5.      That Plaintiff be awarded his costs, attorneys' fees, and expenses in this action pursuant to 17 U.S.C. § 505;

6.      That Plaintiff be awarded pre-judgment interest; and

7.      That Plaintiff may have such other and further relief as the Court may deem appropriate.

Dated: January 3, 2020          **FOLEY BEZEK BEHLE & CURTIS, LLP**

By: */s/ Roger N. Behle, Jr.*
Roger N. Behle, Jr.
Jordan A. Liebman
Attorneys for Plaintiff

**FIRST AMENDED COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a Jury Trial for all claims that can be tried by a jury.

Dated: January 3, 2020                **FOLEY BEZEK BEHLE & CURTIS, LLP**

By: */s/ Roger N. Behle, Jr.*
Roger N. Behle, Jr.
Jordan A. Liebman
Attorneys for Plaintiff

**FIRST AMENDED COMPLAINT**