Harrison J. Dossick (SBN 128319)Email: hdossick@reedsmith.com
Jonathan D. Gershon (SBN 306979)
Email: jgershon@reedsmith.com
Reed Smith LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, CA  90067-6078
Telephone:  +1 310 734 5200
Facsimile:   +1 310 734 5299

Attorneys for Defendants
Paramount Pictures Corporation,
Will Packer Productions, Inc.,
Black Entertainment Television,
LLC, Tina Gordon Chism, Peter
Hyuck, Alex Gregory, Jas Waters,
Will Packer, and James Lopez

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOE GREGORY CARLINI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation; WILL PACKER PRODUCTIONS, INC., a California corporation; BLACK ENTERTAINMENT TELEVISION, LLC, a district of Columbia limited liability corporation; TINA GORDON CHISM, an individual; PETER HYUCK, an individual; ALEX GREGORY, an individual; JAS WATERS, an individual; WILL PACKER, an individual; JAMES LOPEZ, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | No.: 2:19-cv-08306-GW-RAO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[FED. R. CIV. PROC. 12(B)(6)]**<br><br>Date:         March 19, 2020<br>Time:         8:30 a.m.<br>Place:        Courtroom 9D_<br><br>Compl. Filed:   Sept. 25, 2019<br>FAC Filed:      Jan. 3, 2020<br>SAC Filed:      Jan. 22, 2020<br><br>Honorable George H. Wu<br><br>[[Proposed] Order filed concurrently] |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 19, 2020 at 8:30 a.m., or as soon thereafter as counsel may be heard, before the Honorable George H. Wu, United States District Judge, in Courtroom 9D of the above-entitled Court, located at 350 West 1st Street, Los Angeles, CA 90012, Defendants Paramount Pictures Corporation, Will Packer Productions, Inc., Black Entertainment Television, LLC, Tina Gordon Chism, Peter Hyuck, Alex Gregory, Jas Waters, Will Packer, and James Lopez (collectively, "Defendants") will and hereby do move to dismiss Plaintiff Joe Gregory Carlini's ("Plaintiff") Second Amended Complaint ("SAC") for Copyright Infringement, Declaratory Judgment, Unfair Competition, and Breach of Implied-In-Fact Contract (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The purported claims for Copyright Infringement and Declaratory Relief should be dismissed as a matter of law because a comparison of the works at issue reveals that the protectible elements of Plaintiff's unpublished screenplay are not remotely similar, let alone substantially similar to Defendants' motion picture.  These claims cannot possibly be cured by amendment and thus should be dismissed with prejudice.  The purported state law claims for Unfair Competition and Breach of Implied-In-Fact Contract should also be dismissed as each is preempted, fails to state a claim for relief and/or fails to state a federal question and thus may not properly be heard by this court.

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities and the Request for Judicial Notice and Declaration of Kevin Shuai [Docs. 23-24] that were filed in support of Defendants' prior Motion to Dismiss Plaintiff's original Complaint, as well as the papers, pleadings, and other documents on file in this action, matters properly subject to judicial notice, and such other and further oral or documentary evidence as may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on January 10, 2020

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 2 –

1   DATED:  February 7, 2020

2                                        REED SMITH LLP

3

4                                        By:  /s/ Harrison J. Dossick
                                              Harrison J. Dossick (SBN 128319)
5                                             Jonathan D. Gershon (SBN 306979)
                                              Attorneys for Defendants
6                                             Paramount Pictures Corporation, Will
                                              Packer Productions, Inc., Black
7                                             Entertainment Television, LLC, Tina
                                              Gordon Chism, Peter Hyuck, Alex Gregory,
8                                             Jas Waters, Will Packer, and James Lopez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     FACTUAL ALLEGATIONS AND DESCRIPTION OF WORKS ................... 2

    A.   Defendants' Films – What Women Want and What Men Want ............. 2

    B.   Plaintiff's Screenplay – What the F Is He Thinking. ............................... 8

III.    PROCEDURAL HISTORY AND NEW "ACCESS"
      ALLEGATIONS ..................................................................................... 11

IV.     THE INFRINGEMENT CLAIM FAILS AS A MATTER OF LAW ............. 12

    A.   The SAC Fails to Allege Any Defendant Had Access to WTF ............. 12

    B.   WTF and WMW Are Not Substantially Similar as a Matter of
        Law. ................................................................................................... 15

        1.   To State a Claim, Plaintiff Must Demonstrate
            "Substantial Similarity" Between the Works' Protected
            Elements. ............................................................................... 15

        2.   The Court Can Compare the Works and Determine Lack
            of Substantial Similarity on a Motion to Dismiss. ...................... 16

        3.   Applying the Extrinsic Test, The Protectible Elements of
            the Works are not Remotely Similar. ......................................... 17

V.      PLAINTIFF'S REMAINING CLAIMS SIMILARLY FAIL .......................... 29

    A.   Plaintiff's UCL Claim Is Preempted. .................................................... 29

    B.   The Breach Of Implied Contract Claim Must Be Dismissed. ............... 29

VI.     CONCLUSION ...................................................................................... 30

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Alexander v. Metro-Goldwyn-Mayer Studios Inc.*,
  2017 WL 5633407 (C.D. Cal. Aug. 14, 2017) ........................................ 30

6

7

*Alfred v. Walt Disney Co.*,
  388 F. Supp. 3d 1174 (C.D. Cal. 2019) ................................................... 17

8

9

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
  581 F.3d 1138 (9th Cir. 2009) ................................................................. 12

10

11

*Balik v. Spiral Toys Inc.*,
  2016 WL 7496134 (C.D. Cal. Feb. 1, 2016) ........................................... 29

12

13

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ............................................. 18, 23, 24, 27

14

15

*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ........................................................ 16, 23

16

17

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ............................ 12, 13, 15, 28

18

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ...................................................... 16, 19, 23

19

20

*Christianson v. W. Publ'g Co.*,
  149 F.2d 202 (9th Cir. 1945) ................................................................... 17

21

22

*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) ................................................................ 24

23

24

*Esplanade Prods. v. Walt Disney Co.*,
  2017 WL 5635027 (C.D. Cal. Nov. 8, 2017) ............................ 15, 16, 28

25

26

*Evans v. McCoy-Harris*,
  2019 WL 4284504 (C.D. Cal. May 9, 2019) .......................................... 22

27

*Fillmore v. Blumhouse Prods.*,
  2017 WL 4708018 (C.D. Cal. July 7, 2017) .......................................... 14

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– ii –

*Flaherty v. Filardi*,
2009 WL 749570 (S.D.N.Y. Mar. 20, 2009) ........................................................... 25

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) ................................................................... 15, 16, 23

*Gallagher v. Lions Gate Entm't, Inc.*,
2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ..................................................... 27

*Griffin v. Peele*,
2018 WL 5117555 (C.D. Cal. Jan. 19, 2018) .................................................. 13, 14

*Hoff v. Walt Disney Pictures*,
2019 WL 6329368 (C.D. Cal. Aug. 19, 2019) ....................................................... 17

*Jordan-Benel v. Universal City Studios, Inc.*,
859 F.3d 1184 (9th Cir. 2017) ............................................................................... 29

*Kentmaster Mfg. Co. v. Jarvis Prod. Corp.*,
146 F.3d 691 (9th Cir. 1998) ................................................................................. 29

*Kodadek v. MTV Networks, Inc.*,
152 F.3d 1209 (9th Cir. 1998) ............................................................................... 29

*Kouf v. Walt Disney Pictures & Television*,
16 F.3d 1042 (9th Cir. 1994) ................................................................................. 19

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) ............................................................................... 19

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) ................................................................................. 13

*Meta-Film Associates v. MCA, Inc.*,
586 F. Supp. 1346 (C.D. Cal. 1984) ...................................................................... 13

*Olson v. Nat'l Broad. Co., Inc.*,
855 F.2d 1446 (9th Cir. 1988) ............................................................................... 28

*Panton v. Strong*,
2018 WL 5099666 (C.D. Cal. Mar. 14, 2018) ................................................. 13, 14

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) .................................................................................... 17

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– iii –

*Reed v. Nat'l Football League*,
  2015 WL 13333481 (C.D. Cal. Sept. 24, 2015) ...................................... 30

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ..................................... 12, 15, 16, 17

*Rosenfeld v. Twentieth Century Fox Film*,
  2008 WL 4381575 (C.D. Cal. Sept. 25, 2008) ....................................... 28

*Schkeiban v. Cameron*,
  2012 WL 12895721 (C.D. Cal. July 20, 2012) ................................. 13, 14

*Schwarz v. United States*,
  234 F.3d 428 (9th Cir. 2000) ...................................................... 17

*Shame on You Prods. v. Banks*,
  690 F. App'x 519 (9th Cir. 2017)....................................17, 23, 24, 25

*Shaw v. Lindheim*,
  919 F.2d 1353 (9th Cir. 1990), 768 F. App'x 732 (9th Cir. 2019) ............ 15, 16, 17

*Silas v. HBO, Inc.*,
  201 F. Supp. 3d 1158 (C.D. Cal. Aug. 17, 2006), *aff'd*, 713 F. App'x
  626 (9th Cir. 2018) .....................................................*passim*

*Star Fabrics, Inc. v. Wet Seal, Inc.*,
  2014 WL 12591271 (C.D. Cal. Dec. 2, 2014).................................... 12, 14

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000) ...................................................... 12

*White v. Twentieth Century Fox. Corp.*,
  572 F. App'x 475 (9th Cir. 2014) ............................................. 15, 17

*Wild v. NBC Universal, Inc.*,
  2011 WL 13272427 (C.D. Cal. June 28, 2011)...................................... 29

*Zella v. E.W. Scripps Co.*,
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) ............................................ 16

*Zindel v. Fox Searchlight Pictures, Inc.*,
  2018 WL 3601842 (C.D. Cal. Jul. 23, 2018) ....................................... 25

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

**Statutes**

17 U.S.C. § 301(a) ................................................................................................29

**Other Authorities**

https://slate.com/culture/2001/12/the-five-deadly-sins-of-romantic-
   comedies.html ................................................................................................22

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

*What Men Want* ("*WMW*") is an updated reboot of *What Women Want* ("*WWW*"), the hugely successful romantic comedy that defendant Paramount Pictures Corp. ("Paramount") released nineteen years earlier.  *WMW* follows many of the same themes as *WWW,* but reverses the roles and perspectives by portraying a **woman**, rather than a man, as the workplace fish out of water who overcomes gender bias and "gender blindness," and transforms emotionally, after awakening from an accident with the ability to hear the thoughts of the opposite sex.

Plaintiff claims in his Second Amended Complaint ("SAC") that *WMW* is not based on *WWW*, but rather is based on his unpublished screenplay, *What The F Is He Thinking* ("*WTF*"), which utilizes the same unprotectible conceptual "gimmick" as Paramount's earlier-released film (*WWW*) and subsequent derivative work (*WMW*)— *i.e.*, a central character who, after an accident, can hear what the opposite sex thinks.  But Plaintiff does not set forth a single fact plausibly establishing that any of the nine defendants named in this action have ever even seen *WTF*, let alone copied it—even after amending his complaint in an effort to cure his wholly deficient "access" allegations.  For this reason alone, Plaintiff's claims must be dismissed.

Moreover, when the Court actually reviews the works themselves it will see that the works are completely dissimilar, and that there is no legally cognizable "substantial similarity" between the two.  *WMW* (like its predecessor, *WWW*) is a workplace comedy, about Ali, an ambitious, overly-competitive sports agent who, after being denied an expected promotion, uses her telepathic powers to further her career in a work environment dominated by men who do not see her as equal.  Along the way, she evolves into a better person and realizes that she does not need approval from men to measure her success.  Ali's romantic relationship, as in *WWW*, is a subplot that is intertwined with the workplace and personal growth storylines.  *WTF*, by contrast, tells a completely different story, about a woman in a toxic relationship

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 1 –

who discovers that her fiancé ("Mr. Wrong") is cheating on her; begins to date a nice guy ("Mr. Right"); breaks up with Mr. Right, mistakenly believing that he, too, betrayed her; foolishly gets back together with Mr. Wrong; and finally breaks up with him for good when her best friend and Mr. Right team up to expose Mr. Wrong's continued infidelity.  In every relevant measure, the works are entirely different.

Any "similarity" between these vastly different works derives from the non-protectible concept of a protagonist who hears the thoughts of the opposite sex—a concept that Paramount previously utilized in *WWW*, more than a decade before Plaintiff wrote his screenplay—and other elements common to the romantic comedy genre.  As a matter of law, such alleged similarities in basic plot ideas or concepts cannot give rise to an infringement claim, and review of the works reveals that their respective treatments of this unprotectible concept is totally dissimilar.

Courts in this District have not hesitated to dismiss copyright claims at the pleading stage in these circumstances.  Because no amount of discovery can change the content of the works, the SAC should be dismissed in its entirety, with prejudice.

## II.   FACTUAL ALLEGATIONS AND DESCRIPTION OF WORKS[1]

### A.   Defendants' Films – *What Women Want and What Men Want*

***What Women Want***:  *WWW* (Docs. 23-24, Ex. A), a romantic comedy produced by defendant Paramount and starring Mel Gibson and Helen Hunt (SAC ¶¶ 24, 42; *WWW* at 0:11-0:32), follows Nick Marshall, an egotistical, chauvinistic, divorced advertising executive whose life is turned upside down when he gains the ability to hear women's thoughts.  At the film's outset, Nick is expecting a promotion at his advertising firm to creative director, but his boss, Dan, instead announces he has hired Darcy McGuire for the position to broaden the firm's appeal to women.  (*WWW* at 7:00-13:10.)  As Dan explains to Nick, "It's a women's world out there, and getting

---

[1] This fact summary is based on the SAC, and the works incorporated by reference therein, including the deposit copy of Plaintiff's screenplay filed with the U.S. Copyright Office (*see* Docs. 23-24, Ex. A), the motion picture *What Women Want* and the motion picture *What Men Want*, and facts of which the Court may properly take judicial notice.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 2 –

1   into a women's psyche is not exactly your strong suit." (*Id.* at 12:26-33.)

2       During her first meeting, Darcy distributes samples of feminine personal care

3   products and challenges Nick and the other (predominantly female) team members to

4   come up with new pitches that resonate with women.  In the next, physically comedic,

5   scene Nick brings the items home, drinks wine, and tests the products (including

6   waxing his legs and putting on pantyhose) in an effort to get into a woman's mindset.

7   After wondering aloud "what do women want?," Nick slips on bath beads, steps into

8   his bathtub, electrocutes himself when his hairdryer falls in, loses consciousness, and

9   awakens the next morning hearing women's thoughts.  When Nick realizes that most

10  of the women at work dislike him and consider him sleazy, he frantically searches for

11  a cure and so desperately wants to be normal that he even electrocutes himself again

12  (without success).   (*WWW* at 15:43-44:10.)   Nick turns to his former marriage

13  counselor (only to learn that she, too, isn't much of a fan), who can't believe he wants

14  to get rid of such a "brilliant gift;" "Imagine the possibilities," she tells him, "if you

15  know what women want, you can rule."  (*Id.* at 46:25-27; 50:37-44.)

16      Armed with a new perspective, Nick uses his powers to seduce Lola, the young,

17  barista who works in the coffee shop near Nick's office but thus far has resisted his

18  charms.  By listening to Lola's thoughts, Nick finally convinces her to go out with

19  him by pretending to be vulnerable.  On their date, Nick uses his power to seduce her,

20  and to please her during sex by responding to her non-verbal commands, leading her

21  to mentally exclaim "Nick Marshall is a sex god!" (*Id.* at 1:04:27-30.)

22      Nick primarily uses his thought-reading skills, however, to succeed at work.

23  He manipulates and surreptitiously undermines Darcy by reading her subconscious

24  creative ideas and claiming them as his own.  (*Id.* at 56:34-59:33; 1:05:38-1:06:44.)

25  However, as they continue to work closely together, Nick comes to respect Darcy's

26  talent.   He develops strong feelings for her, and they soon become emotionally

27  involved.  (*Id.* at 1:08:47-1:16:43; 1:22:20-1:29:20.)

28      As Nick continues to grow as a person and becomes more sensitive and self-

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 3 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

aware, he uses his powers to bond with his teenage daughter, Alex, after years of neglect, and to recognize that Erin, a bright, under-appreciated secretary, has fallen into a serious depression.  After learning that Darcy was fired (as a result of Nick's earlier sabotage), Nick confesses his duplicity to Dan and convinces him to rehire her (at the expense of the promotion Nick had long coveted).  (*Id.* at 1:40:20-1:42:27.)  Before baring his soul to Darcy, Nick first runs off to save Erin, fearing she may be suicidal.  While he searches for Erin's apartment in the rain, Nick is struck by electric sparks from an overhead high voltage wire.  He finds Erin and offers her a promotion, but realizes he has lost his powers.  (*Id.* at 1:43:06-1:50:05.)  In the final scene, Nick (now powerless) visits Darcy and explains everything.  She fires him, but then forgives him, and the film ends as they share a kiss.  (*Id.* at 1:57:20-2:03:44.)

***What Men Want****:  WMW* (Docs. 23-24, Ex. B) the role-reversed reboot of *WWW*, was released by Paramount in February 2019.  (SAC ¶ 24.)  The film's central character is Ali Davis, a high-powered, type-A, African-American female sports agent, who works at an Atlanta-based, frat-like agency where nearly every other executive is a white male who exudes testosterone.  Ali relies heavily on Brandon, her highly capable, buttoned-down gay assistant, who aspires to be a sports agent (but for selfish reasons, Ali will not promote him) (*WMW* at 0:30-10:55; 1:32:35-1:34:15.)

As in *WWW*, Ali is certain she is about to receive a promotion (to partnership status); as in *WWW*, Ali does not get the promotion and, instead, the coveted slot goes a person of the opposite sex.  As in *WWW*, Ali's boss tells her that part of the reason she was not chosen is because she does not connect well with the opposite sex.  In response, Ali vows to sign Jamal Barry, a local basketball phenom/future NBA superstar, to prove she is better than the male agents.  (*Id.* at 3:40-10:55.)

That night, while dining with her father, Ali is attracted to Will, the new bartender at the restaurant.  She makes the first move and overtly flirts with him.  After he makes her a drink, she hands it back to him so he can have a taste, and seductively and ostentatiously wraps her pinkie around his hand as she places the

– 4 –

straw in his mouth.  The two immediately go back to Will's house and have sex.  Ali is dominant, aggressive and too self-absorbed to realize Will really was not into it. The next morning, Ali wakes up and sees Ben, Will's five year old son, standing a few feet away wearing her panties on his head.  (*Id.* at 13:35-17:15.)  Ali rushes out to meet with Jamal and his overbearing, controlling father/manager, Joe Dolla.  She makes a bad first impression, and is embarrassed to learn that she's been walking around with a used condom stuck to her back. (*Id.* at 18:30-22:00.)

That evening, Ali meets up with her three best friends—Mari, Olivia and Ciarra—for Mari's bachelorette party.  Before they go out, a strange psychic named Sister reads Ali's fortune, telling her "you want to know how to connect with men, right?"  Sister pours Ali a cup of foul-smelling tea; Ali downs the entire cup and begins to hallucinate.  The bachelorette party then moves to a night club, where Ali's buzz kicks into high gear ("I don't know if it's that freaky tea or all of that weed and Hennessey, but honey, I am feeling it") and she lets loose on the dance floor.  In the comedic scene, as she dances with her friends, she gets rammed by a huge pink inflatable phallus, trips toward the stage, falls and hits her head.  (*Id.* at 24:52-31:15.) When she wakes up in the emergency room the next morning (still wearing a pink penis necklace from the night before), the ER doctor tells her she is fine.  Ali then hears what she thinks are the doctor's inappropriate remarks about her, other patients and himself, but she doesn't yet suspect that she actually heard the doctor's unspoken thoughts. (*Id.* at 31:24-32:20.)

While driving to work with Brandon (who's been at the hospital all night, along with Ali's girlfriends), Ali and Brandon together realize that she can hear his snarky, inner thoughts about her.  They both freak out, Ali tells him to stop the car, and she gets out.  As she walks for several blocks before arriving at the office, she hears the random thoughts of each man that passes by (*id.* at 33:21-36:30);   a scene that parallels a similar scene in *WWW* (*WWW* at 31:27-32:52.)   When she gets to the office, the thoughts she hears in the hallways—all coming from the men—are either

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 5 –

lascivious, inappropriate or uncomfortably self-revealing.[2]   As in *WWW*, Ali is desperate to get rid of her powers.  Believing the tea is to blame, she finds Sister, but (like the counselor in *WWW*) Sister convinces Ali that her power is a gift that she can use to prevent men from "holding [her] down" at work.  (*Id.* at 39:15-43:06.)

Using her powers, Ali learns the location of a poker game her male colleagues had been hiding from her.  She crashes the game, which Joe is attending, along with several real-life sports figures.  Ali, using her power, wipes everyone out until only Joe is left, then lets him win to get back in his good graces.  Later, during a pitch to Jamal to choose Ali's agency to represent him, Ali uses her powers to realize that Jamal and Joe are offended by the pitch, and to save the agency.  (*Id.* at 52:02-56:00.)

Ali learns from Joe's thoughts that he still doesn't trust her because she doesn't have a family, so Ali pretends that Will—who has just arrived at her office to return the driver's license she left at his house—is her husband, and Ben is their son.  (*Id.* at 56:55-58:30.)  During the course of this charade, Ben mentions his upcoming birthday and says he wants a racecar birthday cake; Ali promises to get it in order to impress Joe.  (*Id.* at 1:04:50-1:05:20.)

After a double date with Mari and her fiancé (James) (during which James mentally questions why Mari is friends with Ali, who "only gives a s*** about herself"), Ali and Will go back to his place and have sex.  This time (as in the similar scene in *WWW*), because Ali is able to hear his thoughts, she realizes that Will is not satisfied with her performance.  Using her powers, she listens to his desires and is able to satisfy his sexual needs, resulting in Will mentally exclaiming that Ali is "The Greatest."  (*Id.* at 1:13:30-1:15:15.)

Ali's fortunes take a turn for the worse when Joe announces that Jamal is withdrawing from the NBA draft and will play in China, and has signed with a new

---

[2]  As Ali walks down the hall with Brandon, she hears the lewd thoughts of a co-worker, Danny, that she assumes are directed at her.  (*Id.* at 36:17-24.)  Later in the film, she realizes Danny is gay and interested in Brandon, and she then tells Brandon about his "secret admirer."  (*Id.* at 1:09:55-1:10:22.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

agency.  Ali's boss blames Ali, threatens to fire her, and then tells Will that Ali pretended they were married hoping to impress Joe.  Will, incredulous that Ali would use him and Ben like that, breaks up with Ali.  (*Id.* at 1:21:35-1:22:35.)

At Mari's wedding, as Mari and James are about to exchange vows, Ali hears James' thoughts which reveal that he cheated on Mari with her cousin, Gabby.  Ali interrupts the ceremony, declares she can hear men's thoughts,[3] and announces that James slept with Gabby and that Ciarra's husband also cheated on her (but with a man).  During the chaotic, slapstick fight that ensues, a wedding guest picks up a large vase, swings it at Ciarra, but accidentally hits Ali in the head, knocking her unconscious.  When Ali wakes up in the same hospital as before, she is fine, but she no longer hears men's thoughts.  This time, because of her stunt at the wedding, her friends are not there for her.  (*Id.* at 1:25:29-1:28:40.)

After a heart-to-heart with her father, Ali makes amends with Brandon and her girlfriends.  Ali goes to counsel Jamal, who admits he wants to stay in Atlanta but doesn't want to disappoint his father.  Ali tells him the only person he should listen to is himself, because he's the only one who really knows what he wants.  Jamal decides to stay, hires Ali as his agent, and signs with the Hawks.  (*Id.* at 1:33:8-1:40:30.)

As in *WWW*, Ali finally gets the previously denied promotion.  But, also as in *WWW*, Ali, exhibiting personal growth, turns it down, declaring she no longer wants to be part of the boy's club because she realizes her self-worth is not dependent on the approval of men.  Ali starts her own agency, making Brandon an agent.  (*Id.* at 1:41:20-1:44:35.)

In the final scene, Ali shows up at Ben's birthday with the cake she promised him.  She apologizes to Will and explains that when they met she never considered what a man wants or how he feels; all that mattered to her was winning.  She tells Will he taught her that winning doesn't matter if she's a horrible person, and she asks for

---

[3] Brandon tries to intercede "as her friend."  After Ali coldly insults him, saying he's just her assistant and nothing more, Brandon leaves the ceremony.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1 another chance.  He agrees, they embrace, and the film ends with Ali, Will and Ben

2 walking together in the park, discussing Ali's new agency.  (*Id*. at 1:45:11-1:49:11.)

3 **B.     Plaintiff's Screenplay – *What the F Is He Thinking*.**

4 In August 2015, Plaintiff registered a screenplay with the Copyright Office

5 titled *What the F is He Thinking* ("*WTF*," Docs. 23-24, Ex. C), which he had co-

6 written with David Collins (not a plaintiff in this action).  (SAC ¶ 15-16.)

7 The main character of WTF is Angela Smith, a "smart, beautiful, genuine"

8 junior high school health teacher in her mid-20s, who moved to LA from Wisconsin.

9 (*WTF* at 1, 55.)  Angela's boyfriend is Eddie, a "car salesman, smooth, arrogant, self

10 centered asshole."  Although he lives with Angela, Eddie spends his nights clubbing

11 with his single friends, drinking to excess and hitting on women.  (*Id*. at 1-2, 36.)

12 Eddie loudly proposes to Angela at a Pink Taco restaurant, and she accepts.

13 Among those who witness the spectacle is Thomas Riley, a "nice Midwest kid that

14 works at the restaurant," but he and Angela do not meet during this scene.  Thomas

15 lives with his girlfriend, Jessica, a "controlling, bitchy … aspiring actress who is

16 terrible at her craft …." (*Id*. at 6-9.)

17 The next day, Angela attends a yoga class taught by her gay friend TJ,

18 described as "outgoing, witty, energetic, very colorful and flamboyant."  Angela

19 confesses to TJ, "I wish I knew what Eddie was thinking sometimes."  (*Id*. at 9-10.)

20 That weekend, Angela and Eddie attend TJ's afternoon birthday party, where

21 Eddie is detached and standoffish.  After hours of poolside grilling and day-drinking,

22 the group decides to go to a bar.  Angela goes to retrieve her purse, which she left by

23 the pool.  As she bends down to grab it, she trips, falls aggressively, smacks her head

24 on the side of the concrete pool edge, falls into the water, and sinks unconsciously as

25 blood runs out of her nose.  Angela nearly drowns to death, requires life-saving

26 emergency surgery, and slips into a coma.  (*Id*. at 11-17.)

27 When Angela finally wakes up a week later, Eddie and her parents are by her

28 side.  Eddie's and her father's unspoken thoughts are the first things she hears.  While

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 8 –

at the hospital, Angela also hears the thoughts of a male doctor (thinking "Wow, she's a miracle survivor"), a male janitor, several deaf men, a male security guard and a male nurse, and realizes that she has developed the ability to hear men's thoughts.[4] (*Id.* at 16-21.)   After Angela is discharged from the hospital, she tells TJ about her power.   He counsels her not to tell anyone else because "[p]eople will think you're crazy," and that, by using her power, "You might be able to figure out what the f[. . .] guys are thinking after all, especially that fiancé of yours." (*Id.* at 22-26.)

One evening, Thomas is tending bar at the Pink Taco when Angela and Eddie arrive, along with TJ and Jersey, one of Eddie's slimy single friends.   Thomas briefly touches Angela's hand to get her attention and asks if she would like a drink.   After Eddie and Jersey leave to go to a club, Angela and TJ decide to meet them there; however, Angela realizes from Eddie's thoughts that he's not happy she's there, and TJ and Angela don't stay long. (*Id.* at 33-35.)

The next morning, Eddie is hungover and Angela isn't happy.   As they argue, Eddie receives a text from a girl he met at the club.   Angela hears his thoughts: "I can't take this shit …. Totally inviting those girls to Jersey's tonight." (*Id.* at 35-37.)

That afternoon, Angela recognizes Thomas in the parking lot of the school where she teaches.   He is there to pick up his 15-year old brother, Peter, who is a student.   They speak, and when Angela starts her car, it makes a funny noise.   Thomas tells her he's a part-time mechanic and offers to take a look. (*Id.* at 43-45.)

Suspecting that Eddie is cheating on her, that night Angela and TJ drive over to Jersey's house and see Eddie's car parked out front.   They sneak inside and hear a couple having sex upstairs.   Angela walks up, opens the bedroom door, catches Eddie in the act, breaks off the engagement, and moves in with her parents. (*Id.* at 46-48.)

The next day, Angela brings her car to Thomas's body shop, and hears him thinking about asking her out for coffee.   She asks him first and tells him she broke up

---

[4] Angela's doctors suspect she is experiencing side effects from all the medication she is taking (*Id.* at 18, 24), but there is no suggestion that she wants to give back her power or wishes it would stop.

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   with Eddie.  The next day they have a great first date.  Thomas (unbeknownst to
2   Angela) is still living with Jessica, but he breaks up with her that night.  (*Id.* at 49-51.)

3       Thomas and Angela's relationship progresses quickly.[5]  When he takes Angela
4   on a camping trip, she opens up about her relationship with Eddie, and Thomas
5   reveals that he is an aspiring artist.  Angela's relationship with Thomas ends abruptly
6   when Jessica (falsely) claims that she's pregnant and that Thomas is the father.
7   Thomas tells Angela the truth, but as they discuss the situation, Angela realizes for the
8   first time that Thomas and Jessica were still together when she and Thomas went on
9   their first date.  Although Angela doesn't read Thomas' thoughts, she is convinced she
10  cannot trust him and ends their relationship.  (*Id.* at 72-83.)

11      Angela goes out and drowns her sorrows with a co-worker.  Eddie comes over,
12  apologizes and grovels.  They continue drinking and, although Eddie is over the limit,
13  he offers to drive her home.  As they exit the parking lot, Eddie fails to check the
14  traffic and gets T-boned on the passenger side by an oncoming car.  Angela loses
15  consciousness and when she wakes up in the hospital, she is no longer able to hear
16  men's thoughts.  (*Id.* at 86-92.)

17      Angela and Eddie get back together after the car accident, but Eddie hasn't
18  changed a bit.  Thomas tries to convince Angela that Jessica lied about being pregnant
19  but Angela, no longer able to read his thoughts, says she does not believe him.  When
20  TJ and Thomas find out that Eddie is still cheating on Angela, they hatch a plan to
21  expose Eddie's infidelity right before Angela's eyes.[6]  It works, and she finally breaks
22  up with Eddie for good.  (*Id.* at 95-102.)

23  ───────────────
    [5] Shortly after they start dating, Thomas visits her house and meets Angela's parents.
24  After Angela's parents are asleep, she sneaks down and starts kissing him.  Afraid of
    getting caught, they have sex in Angela's father's car, but accidentally disengage the
25  brake and get caught when the car rolls out of the driveway and the alarm goes off.
    Angela hears Thomas' thoughts during the encounter but, unlike in *WWW* and *WMW*,
26  there is no indication in the screenplay that Angela uses her power to improve her
    sexual performance.  (*Id.* at 62-68.)

27  [6] Thomas overserves Eddie at Pink Taco until he passes out.  TJ drives him home,
28  unlocks his phone and invites all of the girls Eddie has been cheating with to arrive at
    his home while Angela is there.

─────────────────
– 10 –

1  In the final scene, Thomas' paintings are being displayed at an art fair.  A
2  spectator admires one of his works—a drawing of Angela showing her as the shining
3  light in a large city—and asks what inspired him.  Thomas' answer summarizes one of
4  the screenplay's major themes: "[t]he demons in this city try to trap you, and hold you
5  back, but when you find the right person, they can set you free ….  This is a personal
6  piece I did, of a girl I met, that gave me hope, that you can find someone in Los
7  Angeles that you can fall in love with."  Thomas then turns around and sees Angela;
8  their eyes meet, and the screenplay ends on Angela smiling.  (*Id.* at 103-105.)

9  **III.    PROCEDURAL HISTORY AND NEW "ACCESS" ALLEGATIONS**

10  Plaintiff's original Complaint was filed on September 25, 2019.  (Doc. 1.)
11  Defendants' Motion to Dismiss, filed On December 13, 2019 (Doc. 22), sought
12  dismissal of each claim pursuant to FRCP 12(b)(6) on the grounds that, among other
13  things, the Complaint failed to allege that any Defendant had access to *WTF*, and that
14  *WMW* and *WTF* are not substantially similar as a matter of law.  Plaintiff elected not
15  to oppose Defendants' motion but rather, on January 3, 2020, filed a First Amended
16  Complaint ("FAC").  (Doc. 28.)  Plaintiff's Second Amended Complaint, filed
17  January 22, 2020, corrected a typographical error in the FAC.

18  In the SAC, Plaintiff alleges a new set of facts in an attempt to establish
19  Defendants' access to *WTF*.  Specifically, Plaintiff now claims that, in 2015 or 2016,
20  he "and/or Collins" (*WTF's* co-author) provided the *WTF* screenplay to four
21  individuals purportedly "connected to" Paramount:

22  •   Dan Guando, who allegedly is now a production manager at Endeavor
23      Content ("Endeavor"), one of the companies that produced the 2018 film
        *Book Club* (which Paramount distributed);

24  •   Josh Henderson, an actor who appeared in the 2005 film *Yours*, *Mine*, &
25      *Ours*; and

26  •   David Ranes and Grace Roder Oppenheimer, who are not alleged to have
        had any direct dealings with Paramount, but rather who are alleged to
27      have, in 2013, joined the same company as Tom DeSanto (a producer and
        screenwriter who has allegedly worked on several Paramount projects).

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  (SAC ¶ 21.)  Notably, Plaintiff does not allege that any of these four individuals sent
2  or shared the *WTF* screenplay to anyone at Paramount (or any other Defendant).

3  Plaintiff also now claims he "and/or Collins" provided the *WTF* screenplay to
4  "over seventy individuals and companies in or connected to the film industry" (SAC ¶
5  22), but Plaintiff does not identify any relationship between any of these "individuals
6  and companies" and Paramount, or any of the other Defendants.

7  **IV.   THE INFRINGEMENT CLAIM FAILS AS A MATTER OF LAW**

8  **A.   The SAC Fails to Allege Any Defendant Had Access to *WTF*.**

9  To prevail on a claim of copyright infringement, a plaintiff must prove, *inter*
10  *alia*, both that (i) the defendant actually copied plaintiff's work, and (ii) that such
11  copying was "unlawful."  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir.
12  2018).  With respect to the first prong, where, as here, direct evidence of "actual
13  copying" cannot be shown, a plaintiff "can attempt to prove that fact circumstantially,
14  by showing that the defendant had access to the plaintiff's work and that the two work
15  share similarities probative of copying."  *Id.* at 1124 (emphasis added).

16  "To prove access, a plaintiff must show a reasonable possibility, not merely a
17  bare possibility, that an alleged infringer had the chance to view the protected work."
18  *Art Attacks Ink, LLC v. MGA Entm't Inc*., 581 F.3d 1138, 1143 (9th Cir. 2009).
19  Access "may not be inferred through mere speculation or conjecture."  *Bernal v.*
20  *Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1053–54 (C.D. Cal. 2010)
21  (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000)).

22  "To adequately allege access by circumstantial evidence, a plaintiff must
23  allege facts either:  '(1) establishing a chain of events linking the plaintiff's work and
24  the defendant's access, or (2) showing that the plaintiff's work has been widely
25  disseminated." S*tar Fabrics, Inc. v. Wet Seal, Inc.*, 2014 WL 12591271, at *3 (C.D.
26  Cal. Dec. 2, 2014) (quoting *Art Attack*, 581 F.3d at 1143).  However, "bare corporate
27  receipt" of the plaintiff's work by an individual who shares a common employer with
28  the alleged copier does not suffice to establish access by chain of events.  *See, e.g.,*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 12 –

*Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016); *Bernal*, 788 F. Supp. 2d at 1056 (collecting cases); *Griffin v. Peele*, 2018 WL 5117555, at *5 (C.D. Cal. Jan. 19, 2018) (granting motion to dismiss).  Instead, "at a minimum, the dealings between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access."  *Meta-Film Associates v. MCA, Inc.*, 586 F. Supp. 1346, 1358 (C.D. Cal. 1984); *see also Loomis*, 836 F.3d at 995; *Panton v. Strong*, 2018 WL 5099666, at *3 (C.D. Cal. Mar. 14, 2018) (granting motion to dismiss).

Put another way, "[a]n inference of access requires more than a mere allegation that someone known to the defendant possessed the work in question."  *Id*.  Rather, "'[t]he nexus between the defendant and the individual possessing knowledge of the plaintiff's work' must be 'sufficiently strong to raise a reasonable possibility of access by the defendant….'"  *Schkeiban v. Cameron*, 2012 WL 12895721, at *1 (C.D. Cal. July 20, 2012) (quoting *Meta-Film*, 586 F. Supp. at 1357).  Here, Plaintiff's allegations that he (or Collins) provided a copy of his screenplay to four individuals (SAC ¶ 21) do not even establish "bare corporate receipt" by Paramount; they certainly do not establish that any of these individuals had such dealings with Paramount involving the requisite "overlap in subject matter" sufficient to give rise to a plausible, and not merely speculative, inference of access.

For example, Plaintiff alleges that Dan Guando is currently employed by Endeavor, a company that produced the film *Book Club* (which Paramount distributed in 2018).  (SAC ¶ 21.a.)  However, Plaintiff does not allege that Mr. Guando had any involvement in the production of *Book Club*, or even that he was employed by Endeavor *at the time Book Club was produced*—much less that he had any dealings with Paramount in connection therewith.  Plaintiff certainly does not, and cannot, allege that Mr. Guando had any dealings with Paramount in connection with *WMW*.

Similarly, Plaintiff does not allege that Mr. Ranes or Ms. Oppenheimer ever had any dealings with Paramount.  He merely alleges that they work with someone (Mr. DeSanto) who worked on past unrelated Paramount projects; but Plaintiff does not,

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 13 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   and cannot, allege that Mr. De Santo had any involvement in *WMW*. Speculation that

2   these individuals "could have shared" Plaintiff's screenplay with does not permit the

3   Court to infer anything more than a "bare possibility of access;" is insufficient to

4   survive a motion to dismiss.[7]

5       Plaintiff's allegation that, in 2015, he (or Collins) gave a copy of *WTF* to an

6   actor (Mr. Henderson) who appeared in *Yours, Mine & Ours*, a film Paramount

7   distributed *over a decade earlier* (SAC ¶ 21.b), also fails. "Courts will not infer

8   access simply because a defendant and a third party worked together on unrelated

9   projects prior to the third party's receipt of the work." *Schkeiban*, 2012 WL

10   12895721, at * 1.

11       Perhaps recognizing that the allegations with respect to these four individuals

12   are insufficient, Plaintiff also alleges that "[o]ver seventy individuals and companies

13   in or connected to the film industry received the Plaintiff's screenplay," and surmises

14   "on information and belief" that "several" of such individuals or entities provided the

15   screenplay to "one or more Defendants." (SAC ¶ 22.) But Plaintiff does not allege

16   that *any* of these "individuals or entities" had any relationship or dealings with any of

17   the Defendants, and does not identify which Defendant(s) received his screenplay in

18   this manner. Such allegations "amount to no more than a speculative list of the

19   potential ways [Defendants] could have theoretically accessed" Plaintiff's screenplay,

20   and fail to "adequately allege[] access by a chain of events." S*tar Fabrics, Inc.*, 2014

21   WL 12591271, at *4 (granting motion to dismiss); *Griffin*, 2018 WL 5117555, at * 5

22   ("chain of hypothetical transmittals" insufficient to allege access); *Fillmore v.*

23   *Blumhouse Prods.*, 2017 WL 4708018, at *5 (C.D. Cal. July 7, 2017) (allegation that

---

24   [7] *See Griffin*, 2018 WL 5117555, at *5 (allegation that purported intermediary's

25   employer produced film, by a director who worked with defendant studio on unrelated productions, was "too speculative" to survive motion to dismiss); *Panton*, 2018 WL

26   5099666, at * 3 (granting motion to dismiss where plaintiff failed to allege the requisite "overlap in subject matter" between plaintiff's dealings with the alleged

27   intermediary and the intermediary's dealings with defendant); *Schkeiban*, 2012 WL 12895721, at * 2 (granting motion to dismiss where Plaintiff failed to plead facts

28   establishing that relationship between alleged intermediary and defendant was "sufficiently strong to raise a reasonable possibility of access").

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

1   manuscript "was sent to various talent agents, literary agents, management companies,

2   publishers, friends and family throughout the U.S." insufficient to plead access).[8]

3       Plaintiff's inability to plausibly plead that any Defendant had access to his

4   unpublished screenplay mandates dismissal of his infringement claims.

**B.    *WTF* and *WMW* Are Not Substantially Similar as a Matter of Law.**

1.    To State a Claim, Plaintiff Must Demonstrate "Substantial Similarity" Between the Works' Protected Elements.

8       As the Ninth Circuit recently explained, even where (unlike here) the plaintiff

9   establishes that the defendant *actually copied* his work, this would not be enough to

10  impose liability, because the Copyright Act does not forbid copying of "ideas" or

11  "concepts"; rather, the plaintiff must demonstrate that the copying in question is

12  *unlawful* because the defendant copied "enough of the plaintiff's [protected]

13  *expression* of those ideas or concepts to render the two works 'substantially similar'"

14  in their "protected elements." *Rentmeester*, 883 F.3d at 1117 (emphasis added).

15  Absent the requisite "substantial similarity" in protectible expression, a plaintiff's

16  copyright claim must be dismissed, regardless of whether a plaintiff has established

17  that defendants had "access" to or "actually copied" its work. *See, e.g., id.; White v.*

18  *Twentieth Century Fox. Corp.*, 572 F. App'x 475, 476 (9th Cir. 2014).

19      "[D]etermining whether works are substantially similar involves a two-part

20  analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883

21  F.3d at 1118; *see also, e.g., Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462

22  F.3d 1072, 1077 (9th Cir. 2006). "A finding of substantial similarity under the

23  extrinsic component is a necessary prerequisite to considering the intrinsic

24  component, which is expressly reserved for the jury." *Esplanade Prods. v. Walt*

25  *Disney Co.*, 2017 WL 5635027 at *17, at *8 (C.D. Cal. Nov. 8, 2017) (citing *Shaw v.*

26  *Lindheim*, 919 F.2d 1353, 1360-61 (9th Cir. 1990)), *aff'd*, 768 F. App'x 732 (9th Cir.

27  _____
[8] Indeed, Plaintiff does not even allege *when* the screenplay was allegedly shared.  *See*

28  *Bernal*, 788 F. Supp. 2d at 1043 ("Defendants must have had access to Plaintiff's
    …work *before* the creation of the allegedly infringing work.") (emphasis added).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

2019).   Accordingly, on a motion to dismiss, only the extrinsic test is relevant; "[a] failure to satisfy the extrinsic component on a motion to dismiss … requires judgment for the defendant as a matter of law." *Id.* (citing *Funky Films*, 462 F.3d at 1077); *see also Rentmeester*, 883 F.3d at 1118; *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1171 (C.D. Cal. Aug. 17, 2006), *aff'd*, 713 F. App'x 626 (9th Cir. 2018).

The extrinsic test "is objective in nature," and "focuses on **articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events** in the two works." *Funky Films*, 462 F.3d at 1077 (quotation omitted, emphasis added).   Critically, in applying the extrinsic test, the Court compares "'not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Id.* (citation omitted); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.").   Similarly, "*[s]cènes à faire*, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement;" nor can "[f]amiliar stock scenes and themes that are staples of literature…." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002).   Thus, "[a]s the Ninth Circuit has emphasized, the Court 'must take care to inquire only whether "the **protectable elements, standing alone**, are substantially similar" and thus must "filter out and disregard the non-protectable elements"'"— including shared ideas, concepts, and *scènes à faire*—"when considering substantial similarity." *Esplanade Prods.*, 2017 2017 WL 5635027, at *8 (quoting *Cavalier*, 297 F.3d at 822) (emphasis in original); *see also, e.g., Rentmeester*, 883 F.3d at 1118.

2.   <u>The Court Can Compare the Works and Determine Lack of Substantial Similarity on a Motion to Dismiss.</u>

"[T]he Ninth Circuit has [long] noted that … 'when a copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'" *Zella v.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007) (quoting *Christianson v. W. Publ'g Co.*, 149 F.2d 202, 203 (9th Cir. 1945)).  *See also, e.g., Rentmeester*, 883 F.3d at 1123 (affirming dismissal where "[n]othing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar").  Indeed, in just the last few years, *numerous* courts in the Central District have analyzed the subject works on a motion to dismiss, applied the extrinsic test, and dismissed copyright claims for lack of substantial similarity.[9]  In conducting this review, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotations and citations omitted); *see also Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (a "court need not accept as true … allegations that contradict facts that may be judicially noticed"); *Silas*, 201 F. Supp 3d at 1173 (allegations that "misrepresent[] the works" are "insufficient to state a claim for infringement").

3.   Applying the Extrinsic Test, The Protectible Elements of the Works are not Remotely Similar.

A review of the works (rather than Plaintiff's self-serving descriptions) and application of the extrinsic test's objective criteria reveals there is no legally-cognizable similarity between the works, much less a "substantial" one.

***Plot and Sequence of Events***:  The plots of the two works are fundamentally dissimilar.  As explained in greater detail *supra* at 2-8, *WMW* (like *WWW*) is primarily

---

[9] *See, e.g., Esplanade Prods.*, 768 F. App'x 732, 734 (9th Cir. 2019) (affirming dismissal of claim that *Zootopia* infringed plaintiff's work); *Silas*, 713 F. App'x at 627 (affirming dismissal of claim that HBO series *Ballers* infringed plaintiff's proposed show *Off Season*); *White*, 572 F. App'x at 476-77 (affirming dismissal that defendants' films infringed plaintiff's screenplay); *Shame on You Prods. v. Banks*, 690 F. App'x 519, 520 (9th Cir. 2017) (affirming dismissal of claim that *Walk of Shame* infringed plaintiff's screenplay); *Hoff v. Walt Disney Pictures*, 2019 WL 6329368, at *5 (C.D. Cal. Aug. 19, 2019) (dismissing claim that animated film *Zootopia* infringed plaintiff's screenplay); *Alfred v. Walt Disney Co.*, 388 F. Supp. 3d 1174, 1190 (C.D. Cal. 2019) (dismissing claim that five *Pirates of the Caribbean* movies infringed Plaintiff's screenplay titled "Pirate of the Caribbean").

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

a workplace comedy, involving an ambitious, overly-competitive protagonist who, after being denied an expected promotion, uses her telepathic powers to further her career in a work environment dominated by men who do not see her as equal.  Along the way, she evolves into a better person and realizes she does not need approval from men to measure her success.  Ali's romantic relationship, as in *WWW*, is a subplot that is intertwined with the workplace and personal growth storylines.  Ali initially uses Will (and his son) as a pawn but eventually develops genuine feelings for him.  When Will learns he's been betrayed and breaks off the relationship, Ali hits rock bottom but they ultimately reconcile once Ali realizes that being a good person and her feelings for Will are more important than winning at all costs.

*WTF* tells a completely different story about a woman in a toxic relationship who discovers her fiancé ("Mr. Wrong") is cheating on her; begins to date a nice guy ("Mr. Right");breaks up with Mr. Right, mistakenly believing he, too betrayed her; foolishly gets back together with Mr. Wrong; finally breaks up with him for good when her best friend and Mr. Right team up to expose Mr. Wrong's continued infidelity; and, in the end, decides to give Mr. Right a second chance.  Angela obtains the power to read men's thoughts early in the story but, other than heightening her suspicion that Eddie is cheating on her (which she later confirms by catching him in the act, not by reading his mind), the power is largely irrelevant to the larger plot, and instead is used primarily to inject non sequiturish levity into the story.

Any "similarity" between the works stems from the fact that both utilize the concept of a woman hearing men's thoughts.  But, as explained (*supra* at 15-16), that two works share the same basic story idea does not equate to substantial similarity, and even where two works "share the same basic plot premise"—which is *not* the case here—that is not sufficient where (as *is* the case here) "a closer inspection reveals that they tell very different stories."  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010).  Indeed, Paramount previously utilized the very same premise in *WWW*, more than a decade *before* Plaintiff wrote his screenplay.  If such a high

concept could support an infringement claim—and it cannot—Plaintiff would be liable to Paramount, not vice-versa.

Despite the vast differences between the works, Plaintiff, as copyright claimants often do, proffers a list of supposed "similarities" in the works' plots. (SAC ¶¶ 29-39.) But, as the Ninth Circuit has repeatedly held, such "lists of similarities" are inherently subjective and unreliable," especially where they "emphasize[] random similarities scattered throughout the works," *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984); *see also, e.g., Cavalier*, 297 F.3d at 825; *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994). Indeed, the Court's review of the works will reveal that *none* of the alleged "similarities" has merit, but rather (i) results from mischaracterizations of the works, or (ii) consist of unprotectible ideas, stock elements and tropes, and *scènes à faire* that flow naturally therefrom (and from the romantic comedy genre in general). By way of example:[10]

• Plaintiff falsely alleges that, in both works, the main character "wishes" she could better understand men. (SAC ¶ 32.) But, in *WMW*, Ali makes no such "wish"—rather, she is *told*, by her boss and a psychic, that she needs to connect better with men. (*Supra* at 5.) In *WTF*, Angela does not want to understand men generally; she only wishes to know what her philandering fiancé is thinking. (*Supra* at 8.) In any event, such basic foreshadowing is not protectible and *was utilized in WWW* when Nick asks himself "what do women want?" *immediately* before the accident that gives him his powers. Plaintiff's allegation that Nick does not express such a desire in *WWW* (SAC ¶ 42.c) is completely false.

• Plaintiff attempts to concoct a similarity from the way in which the protagonists develop their (unprotectible) ability, alleging that, in both works, the main character "hit[s] her head after a night of partying and drinking." (SAC ¶ 34.) But, the idea of a

---

[10] Space limitations preclude Defendants from addressing each of the other "similarities" alleged in the SAC, but a review of the works, themselves, rather than Plaintiff's self-serving allegations, will demonstrate that none comes close to establishing a legally cognizable "substantial similarity."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

character developing supernatural abilities after losing consciousness is an unprotectible trope that Paramount previously used in *WWW*.  (*Supra* at 3.)[11]  Moreover, this allegation mischaracterizes the two (very different) works.  In *WMW*, Ali develops her power after drinking a foul-smelling, drug-laced tea; hallucinating under the influence of the tea (and other substances); dancing wildly with her girlfriends during a nighttime bachelorette party; getting hit with a giant inflatable phallus; banging her head on the stage; and awakening the next morning uninjured. (*Supra* at 5.)   This physically comedic sequence of absurd events resembles the comedic counterpart scene in *WWW* (*see supra* at 3), but it bears no similarity to the tragic events in *WTF* that trigger Angela's power; *i.e.*, nearly drowning to death following a *daytime* (not nighttime, as Plaintiff falsely alleges) pool party with her reticent fiancé.  (*Supra* at 8.)[12]  *See Silas*, 201 F. Supp. 3d at 1173 ("[A]lthough there are some generic similarities … there are no similarities between the actual objective details of the works.").   That both characters drink alcohol during the course of these very different sequences is not a protectible similarity; indeed, this also occurred in *WWW*.  (*WWW* at 36:20-40) (Nick tells his friend "I got drunk … I blacked out, and when I woke up, I could hear what every woman around me was thinking.").

•    Plaintiff's allegation that, in both works "[a]fter the blow to the head, [the protagonist] wakes up in the hospital to discover that she can hear men's thoughts" (SAC ¶ 34) is also false.  In *WMW*, Ali does not become aware of her power until after she has left the hospital and is driving to work with Brandon.  (*Supra* at 5.)  Moreover, there is no similarity of expression between Ali's brief, comedic visit to the

---

[11] Plaintiff's suggestion that he has a protectible interest in the "'chosen' method of becoming unconscious" (SAC ¶ 34) is absurd, as head trauma is perhaps the most stereotypical method of rendering a character unconscious.

[12] Plaintiffs' allegation that, in both works, the protagonist "loses her power after being hit in the head a second time" (SAC ¶ 38), is equally disingenuous.  In *WMW*, Ali loses her power when she is hit in the head with a giant vase during the chaotic, slapstick fight she instigates in the middle of her friend's wedding ceremony.  (*Supra* at 7.)  This does not remotely resemble the serious car accident and resulting injuries that cause Angela to lose her power in *WTF*. (*Supra* at 10.)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   ER (during which she does *not* realize the doctor's inappropriate comments are

2   actually his unspoken thoughts) and Angela's extended hospital stay following a

3   coma and life-saving surgery (during which she <u>does</u> realize she can read minds after

4   hearing numerous men's thoughts) (*Supra* at 5-6, 8-9).[13]   In any event, a hospital visit

5   is a *scène à faire* that flows naturally after a character has been knocked unconscious.

6   •      Plaintiff alleges that "[i]n both stories, the main character uses her power to

7   discover that a male character has been unfaithful in a relationship."    But, the

8   discovery of secrets, including infidelities, is a *scène à faire* in a story about telepathic

9   powers, and there is no similarity in the *expression* of this unprotectible concept.

10   Early on in *WTF*, Angela's power leads her to *suspect* that her fiancé is unfaithful; that

11   night, *without using her power*, Angela catches him in the act and breaks up with him.

12   Angela doesn't lose her power until much later in the story.   (*Supra* at 10.)   By

13   contrast, near the conclusion of *WMW*, Ali discovers (by reading minds) during Mari's

14   wedding ceremony that the groom and another of her *friends'* significant others had

15   been unfaithful (the latter with another man), and the comedic chaos that ensues when

16   she "outs" both of them is what causes Ali to lose her power.   (*Supra* at 7.)

17   •      Plaintiff falsely alleges that, in both works, the main characters meet their love

18   interest "before they gain their power" (SAC ¶ 39.b.i.)   In *WTF*, Angela does not meet

19   Thomas until *after* she has obtained her power.   (S*upra* at 9.)

20   •      Plaintiff's allegation that, in both *WTF* and *WMW*, the love interest "serves [the

21   main character] a drink, they have a bonding moment, and their hands briefly touch."

22   (SAC ¶ 30) mischaracterizes both works.    In *WTF*, Thomas innocently touches

23   Angela's hand to get her attention, *before* he asks if she'd like a drink.   (*Supra* at 9.)

24   By contrast, in *WMW*, *after* Will makes Ali a "bespoke cocktail," she hands the drink

25   back to him, ostentatiously and seductively wrapping her finger around *Will's* hand,

26   and places her straw in his mouth, as an immediate precursor to sex.   (*Supra* at 4.)   In

27   ────────────────

28   [13]   Plaintiff's allegation that both characters realize their power is gone when they cannot hear the thoughts of a "male doctor" (SAC ¶ 38) is also false—in *WTF*, Angela realizes her power is gone when she cannot hear her *father's* thoughts.   (*WTF* at 91.)

any event, a similar scene appeared in *WWW, over nineteen years ago* (*WWW* at 7:28-42) (Nick seductively grasps Lola's hand as she serves him a drink), and a future love interest's act of physical contact (innocent or otherwise) is not a protectible element.

• Plaintiff alleges as a similarity that, in *WTF*, Angela uses her power "for initiating sex," and Ali uses her power "for satisfying [Will's] sexual desires. (SAC ¶ 39.b.i.) Setting aside that this is not a "similarity," the allegation is completely false. In *WTF*, Angela initiates sex with Thomas *without* using her powers, and Angela never uses her power to sexually satisfy Thomas as Ali does with Will in *WMW*. (*Supra* at 10 n. 5.) In any event, the scene in *WMW* was plainly based on a near-identical scene that first appeared in *WWW*, over nineteen years ago. (*Supra* at 3.)

• Plaintiff's allegation that, in both works, the main character "ultimately reconciles with her love interest after a separation earlier in the story" is meaningless because some variation of "girl meets boy, girl loses boy, girl gets boy back" is perhaps the most conventional narrative archetype in the genre, *see Evans v. McCoy-Harris*, 2019 WL 4284504, at *4 (C.D. Cal. May 9, 2019) (noting that "the familiar romantic comedy story arc in which a female protagonist undertakes a journey to find love" is not protectible),[14] and has been utilized in countless films. Further, the protectible *expression* of this stock story arc is completely different in the two works. In *WTF*, Angela breaks up with Thomas because she mistakenly believes she cannot trust him. In *WMW*, Will breaks up with Ali after learning she used him and his son. And, only in *WMW* do we see the two characters actually reconcile. (*Supra* at 8.)

Courts in this Circuit have **repeatedly** rejected infringement claims based on far greater actual (as opposed to fabricated) similarities in ideas and *scènes à faire* than those at issue here. For example, in *Benay*, the Ninth Circuit held that there was no protectible similarity between the film *The Last Samurai* and plaintiff's film bearing the *exact same title*, even though

---

[14] *See also* https://slate.com/culture/2001/12/the-five-deadly-sins-of-romantic-comedies.html ("The classic romantic comedy formula is boy meets girl, boy loses girl, boy gets girl back.").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

[B]oth [works] share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; … both feature the leader of the samurai rebellion as an important foil to the protagonist[; and] in both works the American protagonist is spiritually transformed by his experience in Japan.

*Benay,* 607 F.3d at 625.  The Ninth Circuit recognized that any similarities "flow[ed] naturally from the works' shared basic [and unprotectible] plot premise," and concluded that, "[s]tripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test." *Id.*

And, in *Shame on You Prods. v. Banks,* the court granted a motion to dismiss, holding that there was no protectible similarity between the defendant's film *Walk of Shame* and plaintiff's screenplay *Darci's Walk of Shame,* even though, *inter alia,*

[B]oth works feature a female lead character living in a big city, who breaks up with her boyfriend, gets drunk, spends a 'one-nighter' with a man she just met who works as a busboy/bartender, wakes up disoriented the next morning at his place, puts on the bright dress she was wearing the night before, and embarks on a walk of shame through the city to get to an important event."

*Shame on* You, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015); *aff'd* 690 F. App'x 519 (2017).  Again, the court concluded that "many of the purported similarities … flow directly from the [unprotectible] basic premise of a walk of shame," and that, despite the similarities, the overall "narratives are strikingly different." *Id.* at 1151, 1153.  As in these (and numerous other)[15] cases, the works at issue here tell "fundamentally

---

[15] *See, e.g., Funky Films,* 462 F.3d at 1077-78 (no similarity between two works based on death of family patriarch who leaves two sons to run family funeral home, both of which involve return of one son to hometown to help in the business, another son changing his religion to aid in the business, and competitor bidding on the business); *Berkic,* 761 F.2d at 1293 (no similarity between two works about exposing criminal organization that murders healthy people and sells the organs for transplants); *Cavalier,* 297 F.3d at 824 ("[T]he general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep" is not protected by copyright law); *Silas,* 201 F. Supp. 3d at 1173-76.

different stories," even if they "share [a somewhat similar] premise and … elements that flow naturally from that premise." *Benay*, 607 F.3d at 626.

*Characters*:  To be deemed protectible in the Ninth Circuit, characters must be "especially distinctive" and "contain some unique elements of expression." *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (internal quotations and citation omitted).  A "stock character or basic character type ... is not entitled to copyright protection." *Shame on You*, 120 F. Supp. 3d at 1164.  Nor are "traits that flow naturally from the works' shared premises." *Benay*, 607 F.3d at 626.  "When analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters." *Silas*, 201 F. Supp. 3d at 1177.

Contrary to Plaintiff's allegations, there is no similarity between the works' main characters, *WMW*'s Ali (a high-powered, hard-charging, occasionally duplicitous African-American sports agent motivated by her desire to succeed in a competitive, male-dominated business), and *WTF*'s Angela (a sweet, genuine Midwestern junior high school teacher plagued by her unfaithful, dishonest, egotistical fiancé).  The only conceivable "similarity" is that they both gain the ability to hear men's thoughts; as explained above, this unprotectible premise cannot support an infringement claim.

Most of the character "similarities" that Plaintiff identifies actually involve alleged plot elements, not character traits (SAC ¶ 39.b.i); as explained above, the plot elements on which Plaintiff relies either involve unprotectible *scènes à faire*, or result from Plaintiff grossly mischaracterizing the works.  For example, Plaintiff alleges that "[b]oth women are professionals" (*id.*), but there is no similarity between a high-powered sports agent (whose career is at the heart of the plot in *WMW*) and a junior high-school teacher (whose occupation is barely mentioned in *WTF*).  That two characters have (very different) occupations is not a "similarity."[16]

---

[16] Plaintiff also attempts to contrive a similarity by alleging that "both characters are surrounded by misogynistic men" (*id.*), but there is no similarity between Angela being engaged to a misogynistic, cheating fiancé and Ali working at a frat-like sports agency.  In any case, dealing with misogyny is an unprotectible *scène à faire* flowing indispensably from the unprotectible concept of a woman who hears men's thoughts.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 24 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Plaintiff also argues there is a protectible similarity between the characters of
2  Will and Thomas because both are "polite and likeable bartender[s]" (SAC ¶ 39.b.iii),
3  but "'good guys' with whom the female lead falls in love are stock characters" that
4  cannot be copyrighted. *Shame on You*, 120 F. Supp. 3d at 1164.  Further, despite the
5  SAC's repeated, self-serving references to Thomas as a "bartender," he is actually a
6  jack-of-all-trades, alternately working as a bartender, mechanic, and artist, depending
7  on the requirements of the script.  (S*upra* at 9-11.)  *See Silas*, 201 F. Supp. 3d at 1178
8  (no substantial similarity where plaintiff's allegation "that both characters are
9  'professional football player[s]' … ignores the fact that [one] is an active player
10 whereas [the other] is retired").   In any event, the fact that two characters have a
11 similar (genre-common) job does not support a copyright claim.  *See Zindel v. Fox*
12 *Searchlight Pictures, Inc.*, 2018 WL 3601842, at *9 (C.D. Cal. Jul. 23, 2018) (no
13 similarity where "[v]irtually all that the works' main characters have in common is
14 that they are janitorial employees working the night shift at a scientific testing
15 facility"); *Silas*, 201 F. Supp. 3d at 1179 (that two characters "are both well-dressed
16 football players who are sexually promiscuous, drive fancy cars and have a cocky
17 attitude … is not a protectable expression"); *Flaherty v. Filardi*, 2009 WL 749570, at
18 *16 (S.D.N.Y. Mar. 20, 2009) ("Although both draft screenplays have an attorney
19 protagonist … the attorneys are very different.").

20    Despite this, Plaintiff relies *heavily* on this claimed similarity in occupation,
21 going so far as to suggest (incredulously) that it would be an impossible coincidence
22 for Defendants to create a bartender love-interest without copying Plaintiff's work.
23 (SAC ¶ 33.)   This is not just absurd; it completely misses the point.   Even if
24 Defendants had "actually copied" the idea of a bartender love-interest—and they did
25 not—this would not support an infringement claim, because Plaintiff has no copyright
26 interest in any such stock character.   (*Supra* at 16-17.)   Furthermore, there is no
27 protectible  similarity  of  expression  between  Will,  a  recently  widowed
28 father/bartender, who Ali passes off as her husband to further her career, and Thomas,

the seemingly single bartender/mechanic/aspiring artist Angela pursues on the rebound, who actually still lives with his "controlling, bitchy" girlfriend.  (*Supra* at 8.)[17]  Nor is there any similarity in protectible expression between Will raising his five-year-old son (Ben) and Thomas caring for his fifteen year old brother (Peter).  (SAC ¶ 39.b.iii.)  The respective relationships and their relative plot significance could not be more dissimilar.  Will's devotion to and need to protect his vulnerable young son (Ben) is critical to the plot and theme in *WMW* because they set up the freefall to rock bottom that causes Ali to become self-aware and less self-absorbed.[18]  (S*upra* at 7.)  By contrast, Peter is a minor character who <u>never</u> interacts with Angela, and with whom Thomas interacts crudely, like peers rather than father and son.  *See WTF* at 29 (Thomas tells Peter to "Google [a well-known pornographic actress] bro.  You'll thank me later."); *Id.* at 46 (Peter tells Thomas "[a]ll my friends want to bone" Angela).  *See Silas*, 201 F. Supp. 3d at 1174 (rejecting claimed similarity that two characters "serv[e] as a 'big brother/mentor' to other football players," where "the manner in which [the characters] look out for other football players is almost the exact opposite").

Finally, Plaintiff claims that the characters Brandon and TJ are similar because both are "gay sidekicks" (SAC ¶ 39.b.ii), but these characters could not be more different.  Brandon, Ali's overqualified dutiful assistant, is reserved and buttoned-

---

[17] Plaintiff similarly alleges that Defendants must have copied his work because both protagonists allegedly meet their bartender love-interests in a restaurant (SAC ¶ 33)— *i.e.* the love-interests' place of employment.  Setting aside that there is nothing remarkable, or protectible, about meeting a potential love-interest at their place of employment, this allegation misrepresents the works.  In *WTF*, Thomas serves Angela a drink in the restaurant, but they barely interact, and do not actually meet until the next day, in a school parking lot.  (*WTF* at 30, 43-44.)  In *WMW*, Ali and Will have sex immediately after meeting at the bar.

[18] When Ali perpetrates her faux family farce to impress Joe Dolla, she never considers the damage she might inflict on Ben, an innocent five-year-old who recently lost his mother.  When Ali's charade is exposed, Will has no choice; he has to end their relationship to protect Ben.  Only after Ali loses Will and Ben does she begin to understand the self-destructive consequences of her win at all costs behavior.  (*Supra* at 7.)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   up.[19]  Ali's ironic refusal to promote him illustrates the extent of her selfishness.

2   (*Supra* at 4.)   By contrast, TJ is a more clichéd "energetic, very colorful and

3   flamboyant" (s*upra* at 8) yoga instructor.  He has no work relationship with Angela;

4   they are simply friends who go to parties and bars together.  The mere fact that two

5   very different characters are gay does constitute a protectible similarity.  In any event,

6   the "gay friend/confidante" is an unprotectible stock character.  *See Silas*, 201 F.

7   Supp. 3d at 1179-80.[20]

8       Moreover, as would be expected in two very different stories, there are

9   significant characters in *WTF* that have no analog in *WMW*, and vice-versa.   For

10  example, in *WTF,* Angela's cheating fiancé (Eddie) is a major character and plot

11  driver, yet he has no counterpart in *WMW*; nor do other significant characters like

12  Jersey (Eddie's slimy friend) or Jessica (Thomas' conniving girlfriend).   *WMW,*

13  likewise, features several plot-pivotal characters that have no equivalent in *WTF* –

14  *e.g.,* Jamal (the local basketball star) and Joe Dolla (Jamal's overbearing

15  father/manager); Ali's numerous "frat-boy" co-workers; Ali's close friends (Mari,

16  Ciarra and Olivia), whom she alienates but later makes amends with; and Sister, the

17  psychic Ali believes is the source of her powers.[21]

18      ***Themes***:  As explained, *supra* at 2-8, *WMW* (like *WWW*) is a story of personal

19

20  [19] *See e.g.*, *WMW* at 2:15-19, where Ali notes "just because you're gay, doesn't mean
    you're fabulous."

21  [20] Plaintiff also falsely claims that "[b]oth TJ and Brandon are romantically interested
22  in a man who initially is portrayed as straight."  (SAC ¶ 39.b.ii.)  Brandon never
    shows romantic interest in Danny until Ali tells Brandon Danny is gay and thinks
23  Brandon is attractive.  In any case, there is nothing protectible about a character with
    telepathic abilities discovering secret crushes (indeed, in *WWW* Nick discovers that
24  Darcy has a secret crush on him (*WWW* at 1:12:29-33)), and the mere fact that a
    character is gay does not render this unremarkable trope protectible.

25  [21] *See Benay*, 607 F.3d at 627 ("There are a number of important characters in the
26  Film and the Screenplay who have no obvious parallel in the other work."); *Gallagher
    v. Lions Gate Entm't, Inc.*, 2015 WL 12481504, at * 9 (C.D. Cal. Sept. 11, 2015)
27  ("Outside of the five main characters that comprise each group of friends, both works
    have numerous characters that have no counterpart in the other, and the pervasiveness
28  of these characters points the Court towards finding that the works are not
    substantially similar.").

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 27 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  transformation where the path involves betrayal, personal accountability, honesty and

2  forgiveness.  The overall theme in *WMW* is about self-improvement and learning the

3  importance of putting others' needs above your own professional ambitions, but the

4  sub-themes of gender and racial inequality in the workplace are prominent and

5  meaningful.  The central theme in *WTF*, by contrast is that the "good girl" should

6  chose the "nice guy" over the "bad guy"—an unprotectible stock theme common in

7  romantic comedies but not present in *WMW*.  *WTF's* other major theme, involving the

8  difficulty of finding love in superficial and materialistic Los Angeles (*supra* at 11)

9  also bears no resemblance to any of the sub-themes in *WMW*.

10      ***Setting***:   The settings of the two works likewise are vastly different.  *WMW*

11  takes place in Atlanta, with numerous scenes set in the office of Ali's sports agency,

12  and the city itself is an integral part of Ali's work environment and career aspirations.

13  *WTF* takes place in Los Angeles, and the city exemplifies the broader superficial

14  culture and materialistic value system that align with Eddie and that clash with the

15  contrasting down to earth, genuine culture and value system of the Midwest shared by

16  Angela and Thomas.

17      ***Dialogue***:  "[E]xtended similarity of dialogue [is] needed to support a claim of

18  substantial similarity," *Olson v. Nat'l Broad. Co.*, *Inc.*, 855 F.2d 1446, 1450 (9th Cir.

19  1988); *see also, e.g., Esplanade Prods.*, 2017 WL 5635027 at *17, and "[o]rdinary

20  words and phrases are not entitled to copyright protection."  *Bernal*, 788 F. Supp. 2d

21  at 1071.  Plaintiff does not allege any such dialogue similarity, and there is none.

22      ***Mood and Pace***:   *WMW* is a whimsical, light-hearted, often flippant urban

23  comedy that employs slapstick for laughs.  *WTF,* in contrast, is a darker, more serious

24  story where the main characters sustain life-threatening injuries, escape the abuse of

25  alcoholic parents, and suffer in toxic relationships.[22]

26  ───────────────

27  [22] Because Plaintiff's claim for copyright infringement fails as a matter of law, Plaintiff's derivative claim seeking a declaration of infringement (SAC ¶¶ 50-53) fails

28  as well.  *See, e.g., Rosenfeld v. Twentieth Century Fox Film*, 2008 WL 4381575, at *7 (C.D. Cal. Sept. 25, 2008) ("Because the Court is dismissing the intellectual property

– 28 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## V.     PLAINTIFF'S REMAINING CLAIMS SIMILARLY FAIL

### A.     Plaintiff's UCL Claim Is Preempted.

The Copyright Act expressly preempts "all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(a).   A state law cause of action is preempted by the Copyright Act if (1) the rights that a plaintiff asserts under state law are rights that are equivalent to those protected by the Copyright Act, and (2) the work involved must falls within the "subject matter" of the Copyright Act. *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998).   Plaintiff's UCL claim, which is premised on a violation of the Copyright Act, meets both of these elements and thus is preempted. *See Balik v. Spiral Toys Inc.*, 2016 WL 7496134, at *5 (C.D. Cal. Feb. 1, 2016) (finding Copyright Act preempts UCL claim based on copyright infringement); *Wild v. NBC Universal, Inc.*, 2011 WL 13272427, at *18 (C.D. Cal. June 28, 2011) ("[W]ith respect to the UCL claims…where the alleged improper business activity is the act of copyright infringement, the claim is preempted.").[23]

### B.     The Breach Of Implied Contract Claim Must Be Dismissed.

"To state a claim for breach of an implied-in-fact contract based on the submission of a screenplay, a plaintiff must allege that: (1) he submitted the screenplay for sale to the defendants; (2) he conditioned the use of the screenplay on payment; (3) the defendants knew or should have known of the condition; (4) the defendants voluntarily accepted the screenplay; (5) the defendants actually used the screenplay; and (6) the screenplay had value. *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1191 (9th Cir. 2017).

---

claims on which Plaintiffs' claim for declaratory relief is based, the Court dismisses their declaratory relief claim as well….").

[23] Plaintiff's UCL claim also fails because it is premised on a statutory violation of the Copyright Act, and a UCL claim fails when the "borrowed" violation fails. *See Balik*, 2016 WL 7496134, at *5 (citing *Kentmaster Mfg. Co. v. Jarvis Prod. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998)) ("Because Plaintiff's UCL claim is based on his underlying (and insufficient) copyright claims, it fails for the same reason.").

1    Plaintiff's SAC is completely devoid of any allegations suggesting that Plaintiff

2    submitted or otherwise disclosed his screenplay to Defendants, let alone a disclosure

3    that was conditioned on payment.  Instead, Plaintiff only alleges that he provided his

4    screenplay to third parties that he has not named in this action.  There are no plausible

5    allegations that these third parties shared Plaintiff's ideas with any defendant; even if

6    there were, there are still be no privity of contract between Plaintiff and any of the

7    Defendants.   *See Alexander v. Metro-Goldwyn-Mayer Studios Inc.*, 2017 WL

8    5633407, at *9 (C.D. Cal. Aug. 14, 2017) ("Defendants argue that the Complaint is

9    devoid of this requisite privity between the parties, and the Court agrees.").

10    Indeed, Plaintiff's allegation that he "met with" representatives of certain

11    companies, and "spoke with" potential talent, would not even suffice to support the

12    existence of an implied contract *between Plaintiff and those (unrelated) third parties*,

13    as Plaintiff does not allege that disclosure to those parties was conditioned on an

14    expectation of payment, or that any of those third parties accepted his idea with

15    knowledge of the condition.   *See id.* (dismissing implied contract claim where there

16    were no allegations "that the Creed Idea was offered for sale," or that defendants

17    "voluntarily accepted the disclosure knowing the conditions which it was tendered and

18    the reasonable value of the work."); *Reed v. Nat'l Football League*, 2015 WL

19    13333481, at *3 (C.D. Cal. Sept. 24, 2015) (dismissing implied contract claim for

20    failure to allege disclosure was clearly conditioned on an obligation to pay and that the

21    defendant voluntarily accepted the disclosure, knowing of the condition).  It certainly

22    does not suffice to support the existence of an implied contract with any of the

23    Defendants in this action, none of whom are alleged to have ever spoken to Plaintiff.

24    **VI.    CONCLUSION**

25    For the foregoing reasons, the Court should dismiss the SAC with prejudice.

26

27    DATED:  February 7, 2019             REED SMITH LLP
                                           By:   */s/ Harrison J. Dossick*
28                                              Harrison J. Dossick
                                                Attorneys for Defendants

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 30 –