UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:19-cv-08306-SB-RAP | Date: | February 2, 2021 |

| | |
|---|---|
| Title: | ***Joe Gregory Carlini v. Paramount Pictures Corp. et al.*** |

| | |
|---|---|
| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |

| Victor Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| N/A | N/A |

**Proceedings:**   **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (DKT. NO. 32)**

Twenty years ago, Paramount Pictures Corp. (Paramount) released a movie called *What Women Want*, a film about a man who gains the ability to hear women's thoughts.  Years later, Paramount released a movie called *What Men Want* (*WMW*), a film about a woman who gains the ability to hear men's thoughts. Both films involve hard-charging, ambitious executives who are quick to exploit their mind-reading powers to further their oversized career ambition.

In this copyright action, Plaintiff Joe Gregory Carlini claims that *WMW* copied his 2015 script *What the F Is He Thinking?* (*WTF*).  He has sued those involved in the production of *WMW*, including Defendants Paramount, Will Packer Productions, Inc., Black Entertainment Television, LLC, Tina Gordon Chism, Peter Hyuck, Alex Gregory, Jas Waters, Will Packer, and James Lopez.  Dkt. No. 31, Second Amended Complaint (SAC) ⁋ 47.  Before the Court is Defendants' Motion to Dismiss.  Dkt. No. 32 (Motion).  Plaintiff filed an Opposition, Dkt. No. 33 (Opp.) and an unopposed request for judicial notice, Dkt. No. 34.  Defendants

filed a Reply, Dkt. No. 35.  Defendants move to dismiss Plaintiff's claim for copyright infringement and his derivative claim for declaratory judgment.

## BACKGROUND

Plaintiff is a screenwriter who co-authored *WTF*, a screenplay that explores the basic premise of a woman who gains the ability to hear men's thoughts.  SAC ¶¶ 14-15, 23-24.  Plaintiff registered his script with the U.S. Copyright Office in August 2015 and began "shopping" it to "various production companies, studios, financers and actors."  *Id.* ¶¶ 16, 18.  Plaintiff defines shopping as "the process of circulating and/or pitching a project . . . for the purpose of securing production, financing, and/or distribution of the project."  *Id.*  Plaintiff alleges that "[o]ver seventy individuals and companies in or connected to the film industry received" the screenplay.  *Id.* ¶ 22.  He points to 33 individuals who received copies of the screenplay and mentions six other meetings he had while shopping the screenplay.  *Id.* ¶¶ 18-19, 21-22.  The film was not "picked up."  *Id.* ¶ 20.

Four individuals who allegedly received the screenplay were, broadly speaking, "connected to" Defendant Paramount:  Dan Guando, "a production manager at Endeavor Content, which produced the *Book Club*," a 2018 film that was later distributed by Paramount; Josh Henderson, an actor in a 2005 film produced and distributed by Paramount; and David Ranes and Grace Roeder Oppenheimer, who formed a company with someone who "worked with Paramount on several projects."  *Id.* ¶ 21.

Plaintiff alleges that "the main plot, themes, dialogue, mood, setting, pace, characters[,] and sequence of events" in his screenplay "are substantially and/or strikingly similar" to those in *WMW*.  *Id.* ¶ 30.  Defendants argue instead that *WMW* is a remake of its 2000 film *What Women Want*, a film of a man struggling to move ahead in a female-dominated work environment who gains the power to hear women's thoughts.[1]  Motion at 4.  They further argue that the two scripts are substantially different in all relevant respects.

Plaintiff filed his Complaint on September 25, 2019.  Dkt. No. 1.  Defendants filed a motion to dismiss the Complaint on December 12, 2020.

---

[1] Although Defendants argue at length that *WMW* is similar to *What Woman Want*, their similarity—and there are clear similarities—does not necessarily defeat an infringement claim.  A remake is capable of infringing the work of another.

Dkt. No. 22.  Plaintiff responded by filing a First Amended Complaint on January 3, 2020.  Dkt. No. 28.  Plaintiff filed the SAC on January 22, 2020, solely to correct a minor typographical error.  On February 7, 2020, Defendants filed this motion.  On February 27, 2020, Plaintiff filed his opposition and two unopposed requests for judicial notice.  On March 2, 2020, Defendants filed their reply, and on March 13, 2020, they filed supplemental authority.  This case was transferred to this Court in October 2020.  On January 11, 2021, Plaintiff filed a motion for leave to file a Third Amended Complaint.

## A.  _WTF_

_WTF_ is a romantic comedy centered around Angela Smith, a young teacher from the Midwest.  Dkt. No. 24-3 (_WTF_ script).  Angela is dating Eddie Slight, who is described as "[a] car salesman, smooth, arrogant, [and] self-centered asshole."

The script also features:  Rick Slight, Eddie's brother; Tiffany, Angela's friend; T.J., Angela's best friend, who is a yoga instructor described as "early 30s, outgoing, witty, energetic, very colorful and flamboyant"; Brad, a man at T.J.'s gym whom T.J. likes but assumes is straight; Thomas Riley, a "nice Midwest" love interest who works part time at a bar named "Pink Taco"; Jessica Penn, Thomas's girlfriend, described as a "controlling, bitchy" aspiring actress; and Peter Riley, Thomas's 15-year-old brother.

Early on in the script, Eddie proposes to Angela at Pink Taco, where Thomas Riley was working.  This is the first time Angela and Thomas cross paths, but they do not interact.  The next major scene is at T.J.'s pool party, where Angela is almost killed but survives and gains magical powers.  At the end of the party, an intoxicated Angela goes back to the pool by herself to retrieve her purse, when she trips, "smacks her head on the side of the concrete edge" of the pool, and falls into the water.  "Blood roars out of her nose" as she "sinks unconsciously."  She is discovered by T.J. and rushed to the hospital, where she remains in a lengthy coma and almost dies.  The scene is dramatic and frightening:  "Angela's brain starts bleeding, the lead surgeon, becomes concerned.  Her heartbeat starts to dip. They try to revive her."  The drama purposefully builds:

[Emergency Doctor]

We're losing her!

Angela is near lifeless on the operating table.  They use the Lucas device.  Angela flat lines.  They aggressively use the Lucas device.  Angela is still flat lining.  The surgery team tries to resuscitate her.  Intense music score.  [Close up] on heartbeat device.  Flat lines.  Complete silence.  The surgery team uses a defibrillator to shock Angela[']s heart one more time.  Her heart starts beating.

We have a pulse!

Angela remains in a coma for a week.  When she finally awakes in the hospital one morning, she realizes she can hear men's thoughts.  She hears the thoughts of her father, Gary Smith, and her fiancé, Eddie.  Angela immediately tells her doctor about hearing voices; and her doctor explains that her "hallucinations" are a side effect of her brain surgery.  Later that evening, while sleeping in her hospital bed, Angela is awakened by some yelling.  She opens her door and sees a janitor "cleaning up puke on the ground."  Angela hears the janitor's thoughts, which are "in Spanish, English subtitles."  She roams the hospital floors and "sees three deaf people communicating through sign language" and is able to hear their thoughts.  As she continues to roam, she comes upon a security guard, a vending machine guy, and a male nurse and hears their thoughts.

The next day Angela returns to her house with her parents.  Soon after her return, Angela meets T.J. at a restaurant, where she encounters male bar patrons whose thoughts about a woman observed riding a mechanical bull disgust her.  When T.J. arrives, a male server drops silverware as he walks by Angela and T.J.  As the server bends over to retrieve the silverware, Angela hears T.J.'s crude sexual thoughts about the male server and asks T.J. about them.  When T.J. asks Angela how she knew his thoughts, she reveals her newfound power.  T.J. then convinces her to keep it a secret.

At this point, the script starts to develop the character of Thomas Riley.  Thomas is painting the inside of his home when his girlfriend, Jessica Penn, interrupts and insists that he help her read a movie script for an upcoming audition.  The two argue when Thomas refers to the script as "porn."  Thomas's 15-year old brother, Peter, enters the apartment and remarks about the constant fighting.  Jessica soon "storms to her room" and slams the door.  The two brothers then talk, and Thomas jokes that Jessica wants to be "the next Jenna Jameson," an apparent

reference to a porn star. When Peter asks who she is, Thomas responds: "Google it bro. You'll thank me later."

That evening, while working, Thomas briefly encounters Angela again at Pink Taco. Angela is with T.J., Eddie, and Eddie's friend, Jersey. As Thomas is serving drinks, he touches Angela's hand, smiles, and asks if she would like a drink, which bothers Eddie and sparks a jealous exchange. Eddie and Jersey then leave by themselves to a dance club and discuss the possibility of Eddie's cheating on Angela. When Angela unexpectedly shows up at the club with T.J., she learns that Eddie did not want her there and leaves early. The next morning, Angela fights with Eddie about his constant clubbing and drinking, when he receives a text from a "club girl" he met the prior evening and thinks, "I can't take this shit anymore. Totally inviting those girls to Jersey's tonight." Hearing his thoughts, Angela breaks down crying and leaves for work.

At work, Angela hears the thoughts of male students and later a male co-worker who flirts with her friend Tiffany. After work, Angela and Thomas have a chance encounter in the parking lot, where Thomas is waiting in his car for his brother, Peter, a student at the school. Angela and Thomas talk briefly, and when Angela leaves and tries to start her car, Thomas notices she is having mechanical difficulty and offers to get it fixed at a body shop where he works part time. When Peter comes out, he sees that Thomas had been speaking to Angela. The two brothers have a frat-like exchange, with Peter commenting that all his friends want "to bone her" and Thomas responding with laughter, "[t]hat's funny bud, and highly illegal."

Later that night, Angela and T.J. go to Jersey's house to see if Eddie invited women there. They see Eddie's car parked outside. T.J., who dislikes Eddie, remarks that Eddie is probably cheating on Angela. The two of them quietly enter the unlocked house, and Angela catches Eddie in a sexual act with a woman. Angela confronts Eddie, ends the engagement, and breaks down crying.

Angela goes to her parents' house where she is comforted by her mother and father. When she leaves the next day, her car has problems starting. Angela takes her car into Thomas's shop, where he fixes it for her. She hears that Thomas is thinking about asking her out for coffee and asks him first. When Thomas asks about Eddie, Angela tells him about the breakup. On their date the next day, Angela and Thomas bond over their Midwestern roots, and Thomas tells Angela that he left the Midwest with his brother because of his alcoholic parents. At the end of the date, Angela invites him to have drinks sometime at her parents' house.

Thomas returns to his apartment and breaks up with Jessica in a bitter exchange that ends with Jessica threatening, "[y]ou're going to regret this."

On their second date, Thomas and Angela have drinks and play board games with Angela's parents.  Angela and Thomas get very drunk, leading to a sex comedy scene in Angela's father's car.  While having awkward sex in the car, Thomas sets off the car alarm, and Angela accidently releases the emergency break, causing the car "to roll down the driveway."  Angela's father runs out of the house in his underwear carrying a shotgun and chases the car down a hill until it stops.  The father points the shotgun into the car, only to find Angela and Thomas naked inside.  The next morning, Angela and Thomas have a conversation with Angela's parents that is awkward, mixed with comic sexual overtones, and accompanied by an invitation to attend church.  Before attending church, Thomas bathes in the mother's shower, finds the mother's vibrating sex toy, and "[f]alls through the shower curtain" upon being startled.

The scene shifts to the church, where Angela, her parents, and Thomas are seated together.  The scene has shifted, but the thoughts of the prior evening and earlier morning remain.  Angela hears the incredulous thoughts of her father and Thomas about the sex in the car; the mother's phone then vibrates next to Thomas, startling him once again.  The events in the church are otherwise uneventful: Angela hears the distracted thoughts of congregants and the resigned thoughts of a priest aware of the distraction and craving a beer.  The scene ends with an invitation from Thomas to Angela to go camping the next weekend.

The next weekend, Angela, Thomas, Tiffany, and T.J. go on the camping trip with two of Thomas's friends, Derrick and Jimmo.  They smoke marijuana and enjoy a fire.  Angela and Thomas continue to bond while the rest of the group jokes around the campfire.  But their blossoming romance is ruined when Jessica, Thomas's ex-girlfriend, lies about being pregnant, and Angela finds out Thomas was still in a relationship with Jessica on their first date.

Later that evening, Angela is drinking with Tiffany when they run into Eddie.  Eddie apologizes to Angela, claims he has changed, and professes his love.  Angela and Eddie reconcile and leave the restaurant together.  As they are driving away, Eddie gets into a car accident, rendering Angela semiconscious.  Angela returns to the hospital, but this time she is unable to hear men's thoughts when she awakes.

Soon after Angela returns from the hospital, Thomas encounters T.J. at the gym.  As Thomas and T.J. are talking about Eddie, a "gym girl" overhears the conversation and discloses that she had been dating Eddie "on and off" for the past few months but could not tolerate his talking to so many other women.  Thomas and T.J. then hatch a plan to break up Angela and Eddie.  That evening, Thomas gets Eddie drunk while bartending at Pink Taco.  T.J. takes Eddie home, breaks into his phone, and sees that Eddie has been exchanging texts with 20 women and attaching nude photographs.  T.J. invites all the girls to Eddie's house the following night.  The next night, Angela is at Eddie's house when the women show up, and she finally leaves him upon recognizing that "[s]ome things never change."

The screenplay ends at an art show where Thomas is showing his work.  T.J. is there with Brad.  A spectator asks Thomas about one of the paintings.  Thomas explains that the painting—which depicts Angela—is one of hope and love and not for sale:  "This is a personal piece I did, of a girl I met, that gave me hope, that you can find someone in Los Angeles that you can fall in love with."  As Thomas utters these words, Angela walks up, they make eye contact, and they both smile.

## B.   _WMW_

_WMW_ is a romantic comedy about Ali Davis, a high-powered, fearless, quick-witted, intelligent sports agent who is singularly driven to succeed in a male-dominated agency.  Dkt. No. 24-2, _WMW_ DVD.  So driven is Ali that she is willing to lie, deceive, and manipulate to advance her career.  When she acquires the magical powers to hear men's thoughts, Ali exploits it to her advantage.  But the powers take her on a journey of self-introspection that ultimately transforms her into a better person.

The film opens with Ali working out in her home as she takes business calls.  Brandon, an attentive assistant, meek in demeanor with a nerdy look, enters.  After a sharp exchange, Ali tells Brandon, "just because you're gay doesn't mean you're fabulous."  Like Ali, Brandon is ambitious and would like to become a sports agent.  But unlike Ali, Brandon is quiet about his ambition.  When his ambition surfaces early on, Ali quickly and selfishly quashes it, telling Brandon—"with love"—that he is a great assistant but would be a "shitty agent."

This is a big day for Ali, who expects finally to be made partner in a male-centered firm where she is the outcast woman.  Ali, an African American woman, is seated at a large conference room table surrounded by white men.  The head of the firm, Nick, is holding a football, as is the firm tradition when awarding

partnership.  After some congratulatory words, Nick tosses the football to the new partner—and Ali dives for it, incorrectly thinking that she was the intended recipient.  The partnership instead goes to a young male colleague.  When Ali confronts Nick, he tells her:  "You don't connect well with men."  She then becomes determined to land a young, star athlete (Jamal) to earn the partnership.

To work off her frustration, Ali meets her father at a boxing ring where they box and discuss her being passed over for promotion.  They then go to a bar where Ali spots Will, a bartender she decides to seduce after sending her father home.  Ali and Will have sex at his home during which Ali is aggressive and completely self-absorbed.  When Ali opens her eyes in the morning, she sees a young boy, Will's son Ben, who is wearing her underwear around his head as a "mask."  Ali rushes out, realizing she is late to a photo shoot, where she meets Jamal and has a negative encounter with his over-bearing father, Joe.

After the photo shoot, Ali arrives at a bachelorette party for one of her close friends, Mari.  At the party that features a psychic, Ali's small group of friends agree that she does not connect well with men.  The psychic tells Ali she can "help [her] open [her] inner portal" and gives her a special tea.  After Ali sips the tea, the women go to a night club, where Ali feels strange and wonders if it is because of the "freaky tea," the "weed," or the alcohol she consumed.  In a comic scene on the dance floor, Ali is hit by an inflatable phallus, falls, and strikes her head against the stage.

Ali wakes up the next morning in a hospital bed and hears her male doctor's thoughts but does not recognize her new powers.  She makes this discovery after leaving the hospital on her way to work with Brandon.  They determine that it was the psychic who gave her these powers; and when confronted, the psychic convinces Ali that she can use her powers to advance her career.

Ali uses her powers to find out about the male co-workers' secret poker game, which she crashes and where she uses her mind-reading powers to ingratiate herself with Jamal's father, Joe.  Later, Ali uses her powers to save a sales pitch with Jamal after discovering that Jamal and his father are displeased.  Following the pitch, Will, the bartender, shows up at Ali's work with Ben.  After she hears Joe think, "I don't trust a woman with no family," she lies and tells him that Will and Ben are her family.  They all agree to enjoy a family day together at an upcoming sporting event.

As Ali is walking back to her office from the surprise encounter with Will and Ben, she hears the thoughts of Danny, an erratic co-worker who goes from anger to kindness in an instant. Danny has sexual thoughts about Brandon, and Ali later tells Brandon of Danny's interest. Brandon and Danny eventually start a romantic relationship.

Later, at the sporting event, Ali continues to pretend that Will and Ben are her husband and son to curry favor with Joe (and Jamal). She promises Ben a cake shaped like a race car for his upcoming birthday. At the end of the night, Will asks Ali out, and she accepts. Although she does not intend to go on the date, Brandon steps in and makes it a double date with Mari and her fiancé. On her date with Will, Ali hears Mari's fiancé thinking about having sex with a waitress before getting married and hears Will thinking only about Ali and not the waitress. After her date, Ali again has sex with Will, but this time she listens to his thoughts and tries to be less aggressive and more selfless, leading to a great sexual encounter for both of them.

At work, Ali and the team find out that one of their co-workers had poached Jamal and left the firm to strike out on his own. Ali's boss, Nick, blames her for the loss and reveals the truth to Will about Ali's exploitation of him and his son to further her career. Upset, Will tells Ali to stay away from them.

No longer wanting her powers, Ali returns to the psychic, who advises Ali to let the spirit guide her. At Mari's wedding inside a crowded church, Ali interrupts the ceremony to inform the audience she can hear men's thoughts, insults Brandon when he tries to intervene on her behalf, and discloses that the groom has been cheating on Mari. Her revelations spark a fight that culminates with Ali accidently being hit in the head.

Ali wakes up in the hospital and realizes she can no longer hear men's thoughts. She visits Jamal, who is unhappy with the direction of his career. Instead of trying to pitch Jamal, Ali genuinely and caringly listens to him. She signs Jamal to a contract and is offered a partnership. But she rejects the offer and announces the start of her own firm. A new person, Ali starts to make amends. She apologizes to Brandon and offers to make him a sports agent at her firm; she reunites with Mari and her other friends; and reconciles with Will after humbly showing up at Ben's party with the promised race-car shaped cake. The film ends with Ali, Will, and Ben walking in the park, like a family, discussing her new agency.

## LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Dismissal is proper under Rule 12(b)(6) when the complaint either fails to allege a "cognizable legal theory or fails to allege sufficient factual support for its legal theories."  *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).  To survive the motion, a plaintiff must state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a 12(b)(6) motion, the Court follows a two-step approach.  First, the Court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Nor must the Court "accept as true a legal conclusion couched as a factual allegation."  *Id.* at 678-80 (quoting *Twombly*, 550 U.S. at 555).  Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Id.*

## DISCUSSION

To prove copyright infringement, a plaintiff must prove that the defendant copied protected elements of a work he or she owned.  *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  The copying of protected elements requires proof of "copying" and "unlawful appropriation."  *Id*.  In this case, neither party disputes that Plaintiff owns a valid copyright.  The question is whether Plaintiff has alleged sufficient facts to show copying and unlawful appropriation.

### A.    Copying

Copying is an essential element of a copyright infringement claim because the independent creation of a similar work cannot give rise to liability.  *Id*.  Absence of direct evidence of copying is not fatal to an infringement claim if a

plaintiff has adequate circumstantial evidence thereof—i.e., proof of "access" to the copyrighted work and similarity sufficient to suggest copying. *Id.*[2] "To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). When the evidence of such access is circumstantial, a plaintiff can either "(1) establish[] a chain of events linking the plaintiff's work and the defendant's access, or (2) show[] that the plaintiff's work has been widely disseminated." *Id.* Plaintiff argues access on both grounds.

### 1. Plaintiff has failed to plead sufficient evidence of a link between his work and Defendants' access to it.

A chain of events may be established by providing "[e]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). "[T]he dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." *Id.* (quoting *Meta-Film Assocs., Inc. v. MCA, Inc*, 586 F. Supp. 1346, 1358 (C.D. Cal. 1984)).

Plaintiff points to four individuals who he believes prove access—"an individual who produced a film distributed by [Defendant] Paramount, an actor who acted in a film produced and distributed by Paramount, a producer and screenwriter who worked with Paramount on several film projects, and an individual who worked with Paramount on several projects." Opp. at 9. Notably, Plaintiff does not allege that any of these individuals had any part in the development or production of *WMW*. The first individual worked for a different company, and Paramount merely distributed his unrelated film. SAC ¶ 21. The second individual, an actor, appeared in a single film with Paramount ten years prior to being provided Plaintiff's screenplay. SAC ¶ 21. Such attenuated connections cannot establish access. *See Loomis*, 836 F.3d at 996 (holding that receipt of musical work by employee of defendant who works to find music insufficient to show access). Paramount and the third and fourth individuals are not even directly linked. Instead, Plaintiff alleges that these individuals had at one

---

[2] In this context, a plaintiff may rely on both unprotectable and protectable elements because the issue is whether there is sufficient circumstantial evidence of copying. *Skidmore*, 952 F.3d at 1064. In contrast, only protectable elements may be considered when evaluating the separate issue of unlawful appropriation. *Id.*

point formed a production company with a third party and that third party has independently worked with Paramount.  SAC ¶ 21.

Plaintiff primarily relies on *Kamar International, Inc. v. Russ Berrie & Company*, 657 F.2d 1059 (9th Cir. 1981) to argue that any link to Defendant Paramount is sufficient to establish a chain of events proving access.  Opp. 8-9.  In *Kamar*, one toy company allegedly copied another toy company's design of a stuffed animal.  The two companies shared a manufacturer who was involved in the production of the original toy, and the court found this sufficient to show access.  *Id.* at 1062.  In contrast, Plaintiff only points to two individuals who had direct contact with Paramount, and none of the interactions was substantial or involved the production of the *WTF* script.  *See Loomis*, 836 F.3d at 995 ("[T]he dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access.") (internal quotation omitted).

Thus, the Court finds that Plaintiff has failed to allege access through a chain of events.

### 2.    Plaintiff has failed to plead sufficient evidence to show his work was widely disseminated.

Plaintiff also argues that he has alleged sufficient facts to show that *WTF* was widely disseminated.  Opp. at 8.  "The evidence required to show widespread dissemination will vary from case to case."  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 847 (9th Cir. 2012).  Although most widespread dissemination cases turn on commercial success, courts have "recognized a doctrinal variant that focuses on saturation in a relevant market in which both the plaintiff and the defendant participate."  *Loomis*, 836 F.3d at 997.  In such cases, the plaintiff must allege sufficient facts showing that the protected material sufficiently "saturated" the relevant local market for a period of time and that the defendant "routinely participated" in the market during that period.  *Id.* Defendants clearly participated in the film production market in 2015 when Plaintiff was shopping his script.  Thus, the issue is whether Plaintiff can show market saturation by having met with 70 individuals or companies.

Plaintiff relies primarily on *L.A. Printex*, in which the court found market saturation where the plaintiff sold 50,000 yards of protected fabric over four years primarily in the Los Angeles area.  *L.A. Printex*, 676 F.3d at 847.  But meeting with 70 people is not comparable to selling 50,000 yards of fabric to numerous

customers.  In Los Angeles, the center of the film industry, the distribution of 70 copies of a script does not create a "reasonable possibility" that Defendants had seen the work.  *See Jason v. Fonda*, 526 F. Supp. 774, 776-77 (C.D. Cal. 1981) (finding the availability of hundreds of copies of Plaintiff's book in Southern California bookstores did not show reasonable possibility of access); *Mesre v. Vivendi Universal U.S. Holding Co.*, 2005 WL 1959295, at *4 (D. Or. Aug. 15, 2005) (holding no widespread dissemination of screenplay where plaintiffs had distributed "approximately 211 copies").

Thus, the Court finds that Plaintiff has failed to plead access.  Plaintiff argues that even if access cannot be proven, he may still prevail by showing the works are "strikingly similar."  Opp. at 10.  To the extent that he suggests that a weak showing of access can be overcome by a higher showing of similarity, he is mistaken.  *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000), *overruled on other grounds by Skidmore*.[3]  Nevertheless, even if Plaintiff had alleged sufficient facts to show access, he has failed to plead facts demonstrating the works are substantially similar.

## B.   Unlawful Appropriation

To prove unlawful appropriation, a plaintiff must show that "the works share *substantial* similarities."  *Skidmore*, 952 F.3d at 1064.  The Ninth Circuit uses a two-part test "to determine whether the defendant's work is substantially similar to the plaintiff's copyrighted work."  *Id*.  First, the court applies the extrinsic test by "compar[ing] the objective similarities of specific expressive elements in the two works."  *Id*. (quotation omitted).  Then, the court applies the intrinsic test "for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."  *Id*. (quotation omitted).  The intrinsic test is subjective and must be left for the trier of fact.  *Cavalier v. Random House, Inc.*, 297 F.3d

---

[3] In *Skidmore*, the Ninth Circuit rejected the inverse ratio rule, which permitted "a lower standard of proof of substantial similarity when a high degree of access is shown."  952 F.3d at 1066.  But even before *Skidmore*, the sliding scale inherent in the inverse ratio rule operated in only one direction—i.e., lowering the proof required to show substantial similarity (and not the other way around).  *See Bolton*, 212 F.3d at 486 ("We have never held, however, that the inverse ratio rule says a weak showing of access requires a stronger showing of substantial similarity.").

815, 824 (9th Cir. 2002).  Thus, the court may only apply the extrinsic test at the motion to dismiss stage.[4]

In applying the extrinsic test, the court must distinguish between the protectable and unprotectable aspects of the work.  *Rentmeester*, 883 F.3d at 1118.  Unprotectable elements include "primarily ideas and concepts, material in the public domain, and *scènes à faire* (stock or standard features that are commonly associated with the treatment of a given subject)."  *Id.*  Protectable elements include "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."  *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  In sum, "[i]n applying the extrinsic test, this court 'compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'"  *Id.* (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)).

### 1.    Plot

Both works in this case are centered around the same major plot device:  the female lead gains the power to hear men's thoughts.  Plaintiff does not claim this is indicative of copying, nor reasonably could he—as this is famously the plot in *What Women Want*, a previous Paramount film with the genders reversed.  "General plot ideas are not protected by copyright law."  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) (quoting *Berkic*, 761 F.2d at 1293).  Even so, the major plot points differ from there.  *WTF* focuses on two people in relationships with the wrong person; *WMW* focuses primarily on the protagonist navigating career struggles, with a romantic subplot.  In *WTF*, Angela's career is much less important, as there are only a couple of scenes with her at work, and she encounters no career strife during the course of the story.  In contrast, *WMW* focuses almost exclusively on Ali's career, with her love interest being used mostly as a tool for career success until the end of the movie.  Almost

---

[4] Short of trial, the extrinsic test is "more commonly" applied on a motion for summary judgment.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1123 (9th Cir. 2018), *overruled on other grounds by Skidmore*.  Still, the Ninth Circuit has "repeatedly" affirmed dismissals of copyright infringement claims when a comparison of the literary works, applying the extrinsic test, fails the standard under Rule 12(b)(6).  *Masterson v. Walt Disney Co.*, 821 F. App'x 779, 780 & 780 n.1 (9th Cir. 2020) (citing ten unpublished cases over a decade).

all other plot-point similarities are unmistakably *scènes à faire* of a comedy based on a woman gaining the power to hear men's thoughts.

Plaintiff alleges that there are sixteen plot points he describes as "highly specific, purposeful, and well developed," concluding that "their presence in Defendants' film cannot be explained away as mere coincidence or generic plot elements." SAC ¶ 39(a). The elements are that the female protagonist:

1)   wishes she could better understand men;

2)   hits her head after a night of partying and heavy drinking;

3)   goes to the hospital as a result of hitting her head;

4)   first learns in the hospital she can hear men's thoughts;

5)   hears the thoughts of her doctor at the hospital;

6)   loses the power after hitting her head again;

7)   goes to the hospital again as a result of hitting her head;

8)   realizes she has lost the power in the hospital;

9)   uses that power to her advantage in her relationships and career;

10)  uses the power to read her love interest's mind during sex and to please him;

11)  uses the power to help her friends in personal and romantic relationships;

12)  meets a nice male bartender who stands out from the other sexist and misogynistic men in the story;

13)  develops a romantic relationship with the bartender;

14)  reconciles with her love interest after an earlier separation;

15)  has a close friend/confidant who is gay; and

16)  reads the mind of a man previously believed to be straight to assist her gay friend.

In providing a list of overlapping plot points, Plaintiff adopts a general approach bound to capture superficial similarities, especially in a romantic comedy about a woman who is able to hear men's thoughts. The majority of the identified plot points are generic and, even still, play out differently in each story. *See Funky Films*, 462 F.3d at 1078 (noting that an "uneventful similarity" will not save a plaintiff where "the plots of the two stories develop quite differently").

That the female protagonist in each script "wishes she could better understand men" is a prime example. The mechanism by which each protagonist

realizes her wish is yet another.  Plaintiff argues that gaining powers by being hit on the head is unique and claims there are other ways the protagonist could have gained her powers.  In *WMW*, however, Ali appears to gain her powers through a comic series of events that starts with a psychic and ends with being toppled by an inflatable phallus that lands her in a hospital for an overnight stay, after which she learns of her new power while driving with her assistant.  In contrast, Angela in *WTF* acquires her power through a dramatic series of events that starts with a bloody, frightening accident that lands her in a hospital where she nearly dies, only to wake from a coma a week later to discover in the hospital that she can hear men's thoughts.  Moreover, if a traumatic event causes the power gain and loss, a hospital scene—including the discovery of the gain and loss at the hospital—naturally flows from the general plot.  *Cf. Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) ("there are only a finite number of ways to reveal the secrets behind magic tricks, and the perform and reveal sequence is the most logical 'expression' of this idea"), *overruled on other grounds by Skidmore*.

The similarity of the use of the magical powers is observed only at a high level of generality as well.  Plaintiff contends that each protagonist "uses that power to her advantage in her relationships and career."  This description is so broad that it is certain to sweep in almost every conceivable use of mind-reading ability.  A person's "relationships and career" cover a lot of ground.  And yet the breadth of the description cannot mask the distinctions between the two scripts.  Contrary to Plaintiff's suggestion, Angela did not use her powers to advance her career in *WTF*.[5]  Ali, on the other hand, used her powers primarily for that purpose.  Of course, Ali also used her powers in the course of her "relationships."  In this context, the overlap is minimal and substantially dissimilar.  While Angela reads her love interest's mind during sex, she does not do so to please him or change her conduct.  In contrast, Ali realizes that her sexual approach is overly aggressive and self-centered and adjusts by reading her love interest's mind, improving their mutual encounter.  As for using mind-reading powers to discover infidelity in relationships, the use is more different than similar.  In reaching for similarity, Plaintiff claims that the discovery is achieved "by the same power and leads to the same result, a marriage which was planned to happen does not."  But in *WTF*, Angela uses her powers to catch her own fiancé in the act of cheating and breaks up with him.  In *WMW*, Ali's best friend is the victim of infidelity, which is revealed in a climactic scene during a wedding ceremony.

---

[5] This is not the only liberty that Plaintiff takes in comparing the two stories.  Ali did not first learn that she could hear men's thoughts in the hospital in *WMW*.  She made this discovery on the drive to work from the hospital.

The point of overlap in the "boy meets girl" plot—namely, the love interest is a bartender—is fairly trivial.  More significantly, the love story is different from beginning to end—except to the extent that there is a beginning, a middle, and an end.  In the beginning, Ali uses Will for her sexual gratification.  The initial meeting between Angela and Thomas is fleeting and nonsexual.  In the middle, Ali continues to use Will, this time to advance her career.  Angela and Thomas's relationship develops more slowly through shared experiences.  In the end, the protagonist in each story reconciles after a split, but the break and reconciliation differ.  In *WMW*, Ali and Will break up because he discovers Ali was exploiting him and his child for her career, and they reconcile after Ali becomes more self-aware and less self-absorbed and brings a promised birthday cake to Will's son.  In *WTF*, Thomas and Angela break up because she discovers that he was still with his ex-girlfriend on their initial date, and they reconcile when she overhears him professing his love for her at a chance encounter at an art gallery.  In short, the two stories share little more than a familiar plot point that is central to most romantic comedies and not subject to copyright protection.  *See Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("One cannot copyright the idea of an idealistic young professional choosing between financial and emotional reward, or of love triangles among young professionals that eventually become strained, or of political forces interfering with private action."), *overruled on other grounds by Skidmore*.

The "gay best friend" character is common in comedies, particularly in romantic comedies, and is not a unique plot element standing alone.  But the specific subplot about this supporting character—the protagonist uses her powers to identify for her sidekick a potential love interest who unexpectedly turns out to be gay—is arguably unique and substantially similar.  The extent of novelty, however, must be evaluated in the context of a romantic comedy about a woman who reads the thoughts of men.  Given the basic plot, the discovery of unexpected love interests of different varieties is not that exceptional.

In sum, the overlapping plot points are more superficial than substantial, with the possible exception of a minor subplot.  Overall, the Court does not find Plaintiff has shown substantial similarity in the plot.

### 2.    Sequence of Events

Plaintiff alternatively argues that even if the similarities are based on unprotectable elements, he can prove copyright infringement because "the sequence of events of both [scripts] . . . show striking similarity."  For this

proposition, Plaintiff cites *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990), *overruled on other grounds by Skidmore*.  Infringement may be found where "[t]he totality of the similarities . . . go[es] beyond the necessities of the . . . theme and belies any claim of literary accident." *Id.* at 1363.  Stated differently, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." *Metcalf*, 294 F.3d at 1074.

In *Shaw*, the plaintiff created a  pilot script for a television show called "The Equalizer."  After reading the plaintiff's script and declining to produce the pilot, the defendants created a television series bearing the same name.  919 F.3d at 1355.  The plaintiff claimed that there were "26 strikingly similar events" in both works.  *Id*. at 1362.  The Ninth Circuit found that "[e]ven if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression."  *Id*. at 1363.  More specifically, the court concluded that "the respective plots parallel[ed] each other . . . [,] share[ing] a common sequence and rhythm," such that there was "a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity."  *Id.* (quotations omitted).  In reaching this conclusion, the court summarized the similarities of the two works:

> Both works involve a criminal organization that blackmails a candidate for public office.  Both organizations attempt to kill a prospective Equalizer client, who has discovered their operation, by means of an oncoming truck.  In both scripts, henchmen for the criminal organization interrupt the Equalizer's initial meeting with the client, chase and shoot at the Equalizer and the client, and are foiled as the Equalizer saves the client.  In both scripts, the uninvited Equalizer appears at a party in a tuxedo.  In both, the Equalizer confronts the candidate/blackmail victim after a campaign speech.  After thwarting the leader of the criminal conspiracy, the Equalizer rushes to save a female client from danger.  The Equalizer's actions in both scripts result in the candidate/blackmail victim's withdrawal from the political race.

*Id*. at 1363.

No such concrete pattern exists in comparing the two works in this case.  Instead, Plaintiff has identified sixteen general elements that involve a high-level comparison of movie features that are an obvious outgrowth of a romantic comedy

about a woman who gains and then loses the ability to hear men's thoughts.  As the Ninth Circuit has held, "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).

The selection and arrangement of the unprotectable elements in *WTF* do not form an original pattern that is substantially similar to those in *WMW*.  The overlap in patterns is neither numerous nor original, and the sequencing of the allegedly similar scenes play out differently.  As discussed, the scenes depicting the gain and loss of mind-reading powers—and the sequencing of those scenes (especially the acquisition of the magical powers)—are markedly dissimilar.  The only sequencing similarity is that the gain occurs in the beginning and the loss occurs at the end of the script, an unremarkable phenomenon given the general plot.  Also commonplace is the sequencing of the love interest:  a couple meets, develops a relationship that is fractured by a sudden discovery, and reconciles upon realizing their genuine love.  Nor does the sequencing of the use of the magical powers display noteworthy similarity.  More notable is the difference in its use.  For Angela, the thoughts she hears cause her to discover what she already suspects about the self-centered, duplicitous man she is about to marry.  Ali, on the other hand, exploits her powers to advance her career and discovers that she is the self-centered, duplicitous one.

### 3.      Characters

Characters generally are not subject to copyright protection unless they are "especially distinctive."  *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1451-52 (9th Cir. 1988).  Plaintiff points specifically to the leads, the sidekicks, and the love interests in each script as being substantially similar.

The respective protagonists are not substantially similar characters. Angela—a young woman in her mid-20s with a teaching job that does not appear to be a driving force in her life—is depicted as a nice "midwestern girl" thrust into a materialistic and hedonistic city.  Conversely, Ali is a middle-aged, aggressive, self-absorbed, career-focused woman with a win-at-any-cost attitude.  Although she is not an entirely selfish character (as she seems to care about her female friends), she does not care about men (other than her widowed father).  Until her self-discovery toward the end of the movie, she selfishly uses men who are close in

her life.  Brandon is valued for his ability to advance her career, and Will is used initially for her selfish sexual gratification and later for her career advancement.

Moving beyond the protagonists, Plaintiff notes that each script has "a witty sidekick who is gay."  But, as discussed, the "gay best friend" sidekick is common in romantic comedies; and many of the alleged similarities are general plot points.  As individuals, the two gay characters are notably different.  Brandon is a dominated assistant with suppressed career ambition who appears meek, nerdy, and self-conscious but gains confidence throughout the film; T.J. is a protective best friend who is "outgoing, witty, energetic, very colorful and flamboyant" and who is suspicious of, and dislikes from the outset, Angela's villainous boyfriend.

Lastly, Plaintiff claims the love interests in both scripts are "polite and likeable bartenders who stand out from the other sexist and misogynistic men" and are "raising a young male family member on their own."  *Id.* ¶ 39.  None of these general attributes is sufficient to make the character protectable.  A polite, likeable, and caring man is generic, and "raising a young male family member on [one's] own" is not unique—even when done by a polite, likeable, and caring man.  Moreover, the characters have meaningful differences.  Thomas of *WTF* is also a car mechanic and artist—work that features prominently in important scenes in the script—who has a rocky relationship with a despicable, manipulative girlfriend and a relationship with his teenage brother that is more notably fraternal than paternal in their crude, locker-room style exchanges.  And while Thomas is generally a kind character, he is shown to be devious in his scheming with T.J. to break up Angela's relationship with Eddie.  Will of *WMW* is a gentle, kind, and unattached widower who cares for, and devotes himself wholly to, his young, precocious son.

In short, the characters in the two scripts have superficial rather than substantial similarity.

### 4.   Mood and Pace

"A general mood that flows 'naturally from unprotectable basic plot premises' is not entitled to protection."  *See Shame on You Prods., Inc. v. Elizabeth Banks,* 120 F. Supp. 3d 1123, 1158 (C.D. Cal. 2015).  Plaintiff alleges that both works "feature sexual themes and raunchy humor," and that they "progress at the same pace."  SAC ¶ 41(d).

Both films are comedies with sexual themes and romance, but these are *scènes à faire* of an R-rated romantic comedy.  *See Shame on You*, 120 F. Supp. at

1158 (no substantial similarity in the fact that "both works [were] light-hearted comedies that involve a walk of shame").  And even within this genre, there are differences—with *WTF* featuring darker scenes not found in *WMW*, such as the sequence where Angela sustains her seemingly life-threatening injury resulting in a coma.

*WTF* and *WMW* have some similar pacing, but this mainly stems from the genre and general plot.  The characters are introduced, the protagonist gains her magical powers, the powers produce comedy and romantic turmoil, the protagonist loses her powers, and the story quickly wraps up.  Yet Ali's turmoil is largely self-induced and primarily career-focused, whereas Angela's turmoil is largely caused by others and exclusively focused on romance.  And while both scripts have slow moments, *WTF* contains more (such as an extended camping trip and leisurely dates).  In short, the similarities in the pacing reflect *scènes à faire* of the romantic comedy genre rather than anything unique about *WTF*.

### 5.    Setting

"[C]ommonplace settings such as houses, front yards, offices, restaurants, interiors of cars, and so on," without more, cannot show substantial similarity. *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010).  *WTF* is set in Los Angeles, California, a setting that is important to the story.  The male lead summarizes a major theme of the film as follows:  "The demons in this city try to trap you, and hold you back, when you find the right person, they can set you free."  Dkt. 24-3, Ex. C, 109; *see also id.* at 84 ("It's crazy how money trumps any other quality of people in LA.").  The specific scenes are set primarily in homes, a campsite, bars, and a school.  In contrast, *WMW* is set in Atlanta, Georgia, and much of the plot takes place at the protagonist's sports agency, at work-related sporting events, or at common places like homes or bars.  The principal overlap involves the bars and the church.  Bar scenes are too common to carry much significance; and a church scene, while perhaps relatively less common, is hardly exceptional (and plays out differently in the two films).  The setting is therefore not substantially similar.

### 6.    Theme

"A work's theme is its overarching message."  *Reflex Media Inc. v. Pilgrim Studios*, 2018 WL 6566561 (C.D. Cal. Aug. 27, 2018).  *WTF* is a classic romantic comedy about the protagonist's struggle to find the right person in a vain and materialistic city.  By contrast, *WMW* is about a self-centered protagonist

navigating a sexist work environment who experiences personal insight and growth.  Although Plaintiff claims *WTF* is about overcoming a sexist environment, he fails to point to an example of any such struggle in the script.  Moreover, although *WMW* has a romantic storyline, there is no comparable theme of struggling to be with the "right" person or recognizing the "wrong" one.  Thus, the "overarching message" of the two works is not substantially similar.

### 7.    Dialogue

"[E]xtended similarity of dialogue [is] needed to support a claim of substantial similarity."  *Olson*, 855 F.2d at 1450.  "Ordinary words and phrases are not entitled to copyright protection, nor are 'phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions.'"  *Bernal*, 788 F. Supp. 2d at 1071.  Plaintiff points to allegedly similar dialogue, but almost every challenged line contains ordinary words and phrases such as asking, "What did you say?" or "What the fuck!" or "Wow, she is [really] beautiful"!  The only instance in which the dialogue is similar is where two characters have "echoing thoughts," but the context, wording, and presentation are different.  Thus, the Court finds the dialogue is not substantially similar.

\*      \*      \*

In sum, the Court has considered, individually and collectively, the plot, sequence of events, characters, mood and pace, setting, theme, and dialogue in each of the two works.  Applying the extrinsic test, the Court concludes that *WTF* and *WMW* are not substantially similar as a matter of law and therefore **DISMISSES** Plaintiff's copyright claim and derivative claim for declaratory judgment.[6]  The Court's dismissal of the copyright claims extinguishes the Court's original basis for subject matter jurisdiction.  "The Supreme Court has stated, and [the Ninth Circuit] ha[s] often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'"  *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (quoting *Carnegie-Melon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Weighing the relevant factors, the

---

[6] On January 11, 2021, Plaintiff filed a motion for leave to file a third amended complaint. Dkt. No. 42.  Plaintiff seeks to add additional facts to show access.  *Id.* at 8.  Because the Court finds no substantial similarity as a matter of law, the proposed amendment would be futile.  The Court **DENIES** Plaintiff's motion.

Court declines to exercise supplemental jurisdiction and dismisses the remaining state-law claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3).

## <u>CONCLUSION</u>

The Court hereby **GRANTS** Defendants' Motion to Dismiss Plaintiff's copyright claim and derivative claim for declaratory judgment without leave to amend.  Because the Court finds no substantial similarity between the works as a matter of law, any amendment would be futile.  Finally, because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, the claim under the Unfair Competition Law and the claim for breach of implied contract are **DISMISSED WITHOUT PREJUDICE**.